[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 31, 2009
THOMAS K. KAHN
CLERK

_____

No. 06-16591

_____

D. C. Docket No. 04-02462-CV-WSD

MICHAEL BRYANT,
JOHN DRAKE,
BECKY KELLEY,
HERBERT LOWE,

Plaintiffs-Appellees,

versus

CEO DEKALB CO. VERNON JONES,
MARILYN BOYD DREW,
MORRIS WILLIAMS,
RICHARD STOGNER, in their individual capacities
and in their official capacities

Defendants-Appellants,

JOE STONE,

Defendant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(July 31, 2009)

Before TJOFLAT, ANDERSON and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

In 2001, DeKalb County, Georgia embarked on a wholesale plan to replace its white county managers with African Americans. Three white managers, Becky Kelley, Michael Bryant, and John Drake, proceeding under 42 U.S.C. § 1983, sued the county's Chief Executive Officer, Vernon Jones, who devised the plan and monitored its execution, and three subordinates who assisted him, Marilyn Boyd Drew, Morris Williams, and Richard Stogner, for discriminating against them on account of their race in violation of 42 U.S.C. § 1981[1] and the Equal Protection Clause of the Fourteenth Amendment. A fourth manager, Herbert Lowe, an African American, also joined the suit, alleging that the defendants retaliated against him because he refused to assist them in carrying out Jones's plan of racial

---

[1] We have held that § 1981 does not provide an implicit cause of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981. See Butts v. County of Volusia, 222 F.3d 891, 894–95 (11th Cir. 2000).

discrimination.

All defendants claimed as an affirmative defense that they were entitled to qualified immunity; Stogner additionally asserted that he was entitled to legislative immunity. The defendants moved the district court for summary judgment, basing their motions on these immunity defenses. The court denied the defendants' motions, and they appeal.[2] We now affirm the district court's rulings on qualified immunity but reverse the court's denial of Stogner's defense of legislative immunity.

I.

A.[3]

In November 2000, Vernon Jones was elected DeKalb County's Chief Executive Officer ("CEO").[4] Jones was both the youngest person elected as CEO

---

[2] We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291 and the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545–47, 69 S. Ct. 1221, 1225–26, 93 L. Ed. 1528 (1949) (holding that interlocutory review of non-final judgments is available where the order (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816, 86 L. Ed. 2d 411 (1985) (finding that district court's order denying a defendant's motion for summary judgment based on qualified immunity is an immediately appealable order).

[3] The facts provided here largely track those recited by the district court in its thoroughgoing opinion. See Bryant v. Jones, 464 F. Supp. 2d 1273 (N.D. Ga. 2006).

[4] In the appendix, we provide an organizational chart to assist in understanding the hierarchy of the DeKalb County government.

3

of the county and also the first African American elected to the position. After assuming office on January 1, 2001, Jones publicly announced plans to make the employees of DeKalb County "look like DeKalb County." Jones later explained that this meant bringing a "darker administration" to "the new DeKalb County." To accomplish this goal, Jones and his administration implemented an aggressive restructuring program of the county's government.[5] One part of this reorganization focused on the management of the county's Parks and Recreation Department ("Parks Department").

Jones's policy initiatives, which he specifically aimed at the Parks Department, were implemented by members of the county's senior management who were positioned either within DeKalb County generally or the Parks Department specifically. These managers included Richard Stogner, a white male who served as Jones's executive assistant; Morris Williams, a black male who served as an Assistant County Administrator; and Marilyn Boyd Drew, a black female who initially served as the Parks Department's Director of Recreation Services but was soon promoted to the position of Acting Director of the Parks

---

[5] Under DeKalb County's Organizational Act, the CEO is vested with exclusive authority to supervise and direct the administration of the county government, including the power to set hiring policy and abolish any department, agency, or office. See http://www.co.dekalb.ga.us/boc/pdf/ORGANIZATIONALACT.pdf (last visited June 25, 2009).

Department and later named permanent director of the department.

At the time Jones assumed office, Becky Kelley, a white female who had been employed by DeKalb County since 1976, was Director of the Parks Department—a position she had held since 1992. Kelley exercised authority over the department's operations and programs. Michael Bryant, a white male, was Deputy Director of Revenue Management and Support in the Parks Department, and he reported to Kelley. Bryant had served in the position since 2000. John Drake, a white male who was first employed by the county in 1975, was serving as the Assistant Director of the Purchasing and Contracting Department. Herbert Lowe, an African American male, was hired on September 16, 2002, as the Deputy Director of Strategic Management and Development of the Parks Department.

Kelley, Bryant, and Drake allege that, as a result of Jones's plan to create a "darker administration," they were discriminated against and exposed to a hostile work environment on account of their race. Jones's goal, they claim, was to force them to terminate their employment so he could replace them with African American managers. Lowe, on the other hand, claims that he refused to cooperate in Jones's plan to force out white managers, leading Jones and his administration to eliminate his job in retaliation.

5

B.

1.

During her nine years of service as Parks Department Director, Kelley had performed her duties without complaint. Kelley claims, however, that from the instant Jones became CEO he was openly hostile towards her. For instance, during a phone call, Jones became very angry and confrontational with her. On a second occasion, while in a private meeting in Jones's office, Jones screamed at Kelley and approached her in a menacing way, leading her to fear that he was going to strike her.

Jones also began imposing restrictions on Kelley's job duties by prohibiting her from communicating with members of the press and DeKalb County's Board of Commissioners. When Kelley expressed concern over her treatment to Stogner, he replied that "she didn't understand the geopolitical issues in DeKalb County and that she could not relate to powerful black men."[6]

Kelley's job responsibilities were further limited when Jones prohibited her from interviewing employment candidates unless Williams was present. Consistent with this new policy, Kelley and Williams interviewed candidates for

---

[6] As an example of the general racial hostility aimed at Kelley specifically, and whites in general, in the DeKalb County government, a County Commissioner revealed to a colleague that he "was not going to work with that little white woman [Kelley]."

the position of Parks Department Deputy Director of Recreation Services. After conducting several interviews, Kelley, based on her years of experience in the Parks Department, determined that a white male was the top candidate. Williams, however, told Kelley that they could not recommend the candidate to Jones because Jones would not accept a white candidate for the position. Stogner later directed Kelley to recommend Drew, a less qualified African American candidate, for the position so that Kelley could "get in good" with Williams. Drew was hired on April 30, 2001.

After Drew was hired, Jones and Williams continued to narrow the scope of Kelley's responsibilities by excluding her from all discussions and decisions regarding the operations of the Parks Department. Instead, Jones and Williams began to coordinate with Drew, who was Kelley's subordinate. Kelley was also excluded from participating in the Parks Department's hiring process. According to Stogner, Kelley was shut out of the Parks Department's decision making process because Jones wanted "to showcase black parks and showcase black employees."

Without warning or explanation, Jones issued an executive order on February 12, 2002, which Stogner drafted, removing Kelley as Parks Department

Director and reassigning her to the county's Greenspace Program.[7]  Jones then appointed Drew to serve as Acting Director of the Parks Department.  Although Kelley's reassignment did not affect her salary or benefits, it did bring about a significant change in her duties and authority.  For instance, Kelley had no title, and she reported to an Assistant County Administrator[8] rather than the CEO's office.  Drew also attempted to move Kelley to a windowless office that had previously been used as a storage area.[9]  While in the Greenspace Program, Kelley found that any input she offered concerning the program was ignored, causing her to conclude that she had no authority or responsibility—in fact, she described her job as "coloring maps."[10]  On September 25, 2002, seven months after her reassignment, Kelley submitted her resignation, effective October 9, 2002.

---

[7]  The DeKalb County Greenspace Program is part of a statewide initiative to retain parks, natural preserves, and recreational centers for the purpose of curbing the deleterious effects of urban sprawl in and around the Atlanta region.  See https://dklbweb.dekalbga.org/Greenspace/greenspace.asp (last visited June 12, 2009).

[8]  It is unclear from the record whether Kelley continued to report to Williams or another Assistant County Administrator.

[9]  Kelley objected to being moved into the new office space and was not moved.

[10]  Kelley stated that she found the transfer "personally and professionally humiliating" and considered it a demotion.  She asserted that she was "taken from a position of great stature and prominence and placed into a highly subordinate role where [she] moved from personally managing a $10 to $20 million bond budget to having no financial oversight, from [having responsibility over 600 positions] to having quasi oversight over three people."

8

2.

After Drew became Parks Department Director, Bryant alleged that she, at Jones's urging, began making numerous changes within the department that adversely affected him.[11] For instance, Drew began assigning Bryant, who served as the Deputy Director of Revenue Management and Support, duties ordinarily performed by the Deputy Director of Recreation Services. Also, in March 2002, after Bryant complained to Drew about what he considered to be excessive expenditures made by a black contractor who had been hired to perform services at the county golf course, Drew reassigned fiscal and contracting oversight for golf and tennis contracts from Bryant to Drake. Drew assigned operational responsibilities for golf and tennis contracts to Detrick Stanford, a black employee who reported to Drew.

Approximately sixty days after Drew changed Bryant's duties, she moved him from the Parks Department's primary office in Decatur to a satellite office in Tucker, Georgia. Bryant claims that he made numerous requests for personnel and equipment to assist him, but these requests were denied. Drew also excluded him from making decisions and participating in meetings concerning matters for which

---

[11] Jones had previously stated that Bryant was a "white bastard who's nothing more than a racist and need[s] to go."

he was responsible while she sought greater input from African American managers. Drew also required Bryant and other white managers to schedule appointments if they wanted to meet with her while allowing African American managers open access.

During this time, Drew repeatedly threatened to terminate or suspend Bryant and drafted letters to that effect, which she left in plain sight for Bryant and others to see. She, however, never submitted the letters, and Bryant was never suspended or terminated.[12] Bryant continues to serve as Deputy Director of Revenue Management and Support Services but only performs the limited duties assigned to him by Drew.[13]

3.

After Jones removed Kelley as Parks Department Director, he had Drake,

---

[12] Before this lawsuit was brought, Bryant filed a hostile work environment complaint against Drew with the DeKalb County Human Resources Department. Bryant thereafter sent several e-mails to the County EEO Manager, Curtis LeBlanc, inquiring about the status of his complaint, but LeBlanc never responded. LeBlanc interviewed all the witnesses listed in the complaint, except Lowe, who refused to testify, apparently out of fear of retribution from the defendants. Nine months after Bryant filed the complaint, LeBlanc submitted his findings to Stone, Director of Human Resources. The report indicated some problems with respect to Drew and Bryant's relationship, but it did not conclude that the problems were racially based. Both Joe Stone and Stogner reviewed the report and concluded that no discrimination occurred. The Human Resources Department failed to contact Bryant to inform him of its decision.

[13] Marvin Billups, a black male, was hired as Deputy Director of Recreation Services in October 2003. However, Bryant continues to perform the tasks included within the Deputy Director of Recreation Services job description that Drew assigned him.

10

who had been with DeKalb County for over twenty-five years, transferred from the Purchasing and Contracting Department, where he had been the Assistant Director, to the Parks Department, where he was again to serve as Assistant Director. Drake told Stogner that he was interested in becoming the new Parks Department Director, but Stogner told him that, although he was qualified for the position, Drew, a black female, would be given the position because Jones had made "too many political commitments."[14] Jones and Stogner nevertheless wanted Drake transferred to the Parks Department to "prop up" Drew.[15]

After Drake's transfer to the Parks Department, Drew eliminated all of the duties that he would typically perform as Assistant Director, relegating him to performing tasks usually assigned to lower-level employees. Drew also modified the organizational hierarchy by requiring Deputy Directors to report directly to her rather than Drake. Drew also removed Drake as the Parks Department's representative to the county bond program group, of which he had been a member

---

[14] In fact, Jones prevented Drake from competing for the position of Director of the Parks Department. Jones accomplished this by designating the position as an intra-departmental promotion, meaning only Parks Department employees could apply. And, because February 25, 2002 to March 8, 2002 was the designated application period, Jones made Drake's transfer effective March 16, 2002; as such, Drake, as an employee of the Purchasing and Contracting Department, could not apply for the position until eight days after the application period had ended.

[15] Stogner admitted that he did not carefully review Drew's qualifications. He did not call any of her references, and he could not recall whether he so much as looked over her résumé.

since 1986, and excluded him from discussions concerning the department's operations. Drake continues to work as Assistant Director of the Parks Department.

4.

Lowe, an African American male and, at one time, a personal friend of Jones, began working as the Parks Department's Deputy Director of Strategic Management and Development on September 16, 2002. Lowe claimed that he was told by Joe Stone, DeKalb County's Director of Human Resources and an African American, that Jones was aggressively seeking to increase the number of African American managers in the county.[16] According to Lowe, Stone further revealed that, pursuant to Jones's edict, white applicants would never be considered for Lowe's position and that "white folks" were generally ineligible for positions in DeKalb County. Lowe stated that Jones, along with Drew and Williams, informed him of his broad plan to eliminate white managers and replace them with African Americans. Jones told Lowe that he wanted him to be a "team player." Detailing

---

[16] Statistically, Jones's plan seemed to be succeeding. When Jones became CEO in January 2001, there were 98 managerial employees at the county pay grade 33, which were positions over which the CEO had sole hiring authority. At that time, of those 98 managers, 61 were Caucasian and 33 were African American. Four years later, in August 2005, there were 122 managers at pay grade 33. Of those 122 managers, 58 were Caucasian and 60 were African American. Thus, the number of African American county managers almost doubled from 2001 to 2005, while the total number of Caucasian managers decreased slightly during the same time period.

his plan, Jones revealed that "we don't fire people around here; we eliminate their position." When Drew welcomed Lowe to the Parks Department, she reiterated that Jones wanted white managers forced out of the department and replaced with African Americans, and she expressed her unequivocal support of Jones's policies and her intent to comply with his wishes.

Jones also sought Lowe's assistance in executing his agenda to create a "darker administration." During their conversations, Lowe claimed that Jones referred to Bryant as a "white bastard" and expressed his wish to force Kelley, Bryant, and Drake out of the Parks Department. Singling Kelley out, Jones stated that he wanted to eliminate her from the Parks Department because she had previously terminated African Americans and, in his view, had allowed white associations to control the parks. To accomplish Jones's goal of eliminating white managers, Drew instructed Lowe to "dig up dirt" on all white employees within the department and ensure that white employees were not placed in highly visible positions. In particular, Drew directed Lowe not to speak with Drake about important issues, hoping that, by keeping him in the dark, Drake would become frustrated and ultimately fail in his position. Drew also revealed to Lowe that she had transferred Bryant to a position for which he had no experience in the hopes that it would create the appearance that Bryant was incapable of performing his

job. Another tactic Drew employed to further Jones's plan was to antagonize white managers during meetings; thus, there were several instances where Drew met with Lowe to discuss how she could frame issues and questions to annoy and embarrass Bryant and Drake. In the end, according to Lowe, Jones, Drew, and Williams hoped that by creating a negative and hostile work environment for the white managers, and limiting their opportunities for responsibility and advancement, the white managers would resign.

Lowe refused to participate in the plan and failed to carry out any orders designed to discriminate against whites. Jones told Lowe that by refusing to assist in executing his plan he was not being a "team player" and did not fully appreciate and understand what Jones was trying to accomplish. Lowe reiterated that he did not want to be a part of Jones's scheme, and he requested a transfer out of the Parks Department. Lowe stated that if he was not reassigned, he would resign.

Soon after this exchange with Jones, Lowe was moved to an office in Jones's executive suite. While Lowe continued to work for the Parks Department, he also began working on several projects directly assigned to him by Jones. On July 23, 2003, Drew hired Marvin Billups, an African American, as the Parks Department Deputy Director of Strategic Management and Development, the same position held by Lowe. Billups's employment was characterized as "time-

14

limited," meaning that the appointment was temporary. Because it was time-limited, the position did not have to be publicly advertised and was not open to a competitive hiring process. Before the position expired, Billups was named Deputy Director of Recreation Services. Despite the title change, Billups continued to perform the same tasks typically assigned to the Deputy Director of Strategic Management and Development.

Jones later submitted to the County Board of Commissioners the 2004 proposed budget, which Stogner developed and drafted with Drew's assistance. A feature of the proposed budget was the elimination of funding for Lowe's Deputy Director position. On January 27, 2004, the Board of Commissioners approved the budget, and Lowe's position was dissolved. Out of 600 positions listed on the budget, Lowe's was the only position eliminated. Billups, who had been transferred out of the abolished position, continued working for DeKalb County performing the same tasks previously assigned to the Deputy Director of Strategic Management and Development but under the new job title of Deputy Director of Recreation Services. Soon thereafter, Stogner offered Lowe the position of Parks Maintenance Coordinator, a job that came with less responsibility and a lower salary. Lowe refused the offer and resigned.

Lowe appealed the Board's decision to eliminate his position to the DeKalb

County Human Resources Department. Although he was provided a hearing, Lowe did not attend because Stone convinced him that there was "no use" to appeal.

C.

On August 24, 2004, Kelley, Bryant, Drake, and Lowe filed a six-count complaint against Jones, Drew, Stogner, and Williams.[17] Counts I, II, and IV, each brought under 42 U.S.C. § 1983, prayed for compensatory and punitive damages. Count I alleged that the defendants discriminated against Kelley, Bryant, and Drake on account of their race in violation of the Equal Protection Clause of the Fourteenth Amendment by subjecting them to hostile work environments, and, in Kelley's case, to a constructive discharge. Count II alleged that the discrimination Kelley, Bryant, and Drake sustained in Count I also infringed their rights under 42 U.S.C. § 1981. Count IV alleged that the defendants retaliated against Lowe, in violation of 42 U.S.C. § 1981, for refusing to participate in the defendants' scheme to discriminate against white managers.

The defendants individually answered the plaintiffs' complaint by denying

---

[17] The defendants were sued in both their official and individual capacities. This appeal is limited to the claims brought against them in their individual capacities. The complaint also named Stone as a defendant. He has been dismissed from the case; hence, in referring to the defendants, we omit his name.

liability and asserting as an affirmative defense that they were entitled to qualified immunity. Stogner, in responding to Count IV, also asserted legislative immunity as a defense. After discovery closed, the defendants separately moved for summary judgment, relying principally on their qualified and legislative immunity defenses. In an order entered on November 10, 2006, the district court denied the defendants qualified immunity, stating that it did "not believe the law allows a public official defendant to engage in calculated racial discrimination costumed in a racially neutral garb of administrative actions so it can masquerade as a qualified immunity defense." The court also rejected Stogner's defense of legislative immunity.[18] We now consider the merits of the defendants' appeals.

## II.

We review <u>de novo</u> a district court's ruling granting or denying qualified immunity, resolving all issues of material fact in favor of the non-moving party. <u>See</u> <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1190 (11th Cir. 2002).[19]

_____

[18] The November 10 order also disposed of other issues not relevant here.

[19] Plaintiffs argue that we lack jurisdiction to consider the present appeal because the defendants have failed to offer an appealable issue of law; instead, according to the plaintiffs, the defendants merely argue that the record provides insufficient evidence to support plaintiffs' allegations. Plaintiffs' argument is incorrect, as the defendants advance an appealable issue. The issue of whether a defendant is entitled to qualified immunity is purely a legal question; as such, an appellate court reviewing a defendant's denial of qualified immunity considers the facts as presented by the plaintiff in the light most favorable to him, and juxtaposes that set of facts with relevant case law to determine whether those facts support a claim that defendant violated a right based on an earlier articulated ruling or clearly established legal principle, or a principle so

17

A.

The doctrine of qualified immunity shelters government officials

performing discretionary functions "from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S.

800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982); see also Anderson v.

Creighton, 483 U.S. 635, 638–639, 107 S. Ct. 3034, 3038–39, 97 L. Ed. 2d 523

(1987); Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003). The doctrine

"balances two important interests—the need to hold public officials accountable

when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably."

Pearson v. Callahan, 555 U.S. ___, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

---

closely analogous to an established legal concept that we can conclude that the emanating right was itself "clearly established." See Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); Koch v. Rugg, 221 F.3d 1283, 1296 n.28 (11th Cir. 2000) ("When we, like the district judge, view the facts for summary judgment purposes most favorably to the plaintiff, a pure issue of law is created.") (citation and quotations omitted). While the Supreme Court in Johnson v. Jones, 515 U.S. 304, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995), held that appellate courts do not possess jurisdiction over every interlocutory appeal based on a denial of qualified immunity, it narrowly defined the proscribed class of cases as those where a defendant merely contests the merits of the plaintiff's underlying action. Id. at 308, 115 S. Ct. at 2154. In other words, we do not have jurisdiction to entertain such appeals when the defendant's argument is merely, "I didn't do it." We are not here presented with such a case.

18

To receive qualified immunity, the public official must establish that he was engaged in a "discretionary function" at the time he committed the allegedly unlawful act. Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1263–64 (11th Cir. 2004); see 1 H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 162 (Tent. Ed. 1958) ("Discretion" is "the power to choose between two or more courses of action each of which is thought of as permissible."). If the official demonstrates that he was engaged in a discretionary function, the burden shifts to the plaintiff to prove that the official is not entitled to qualified immunity. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003). This requires plaintiff to satisfy the two-part test prescribed by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Under Saucier, a plaintiff must first show that the defendant violated a constitutional right and then demonstrate that the constitutional right was clearly established at the time of the alleged wrongful act. 533 U.S. at 201, 121 S. Ct. at 2156. If a court, after viewing all the evidence in the light most favorable to the plaintiff and drawing all inferences in his favor, determines that the plaintiff has satisfied these two requirements, the defendant may not obtain qualified immunity. Holloman, 370 F.3d at 1264.

While Saucier mandated this two-part order of battle, the Supreme Court,

upon realizing the inefficiency of such an inelastic approach, recently retreated from this protocol, finding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. ___, 129 S. Ct. at 818. The Supreme Court noted, however, that its "decision does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." Pearson, 555 U.S. ___, 129 S. Ct. at 821.

In this case, the officials argue—with respect to each claim the plaintiffs asserted—that, as a matter of law, (1) they were engaged in a discretionary function when they committed the acts at issue, (2) the acts did not violate a statutory or constitutional right, and (3) if their acts did violate a statutory or constitutional right, the right was not clearly established at the time.

1.

We need not tarry long in resolving the first issue—whether defendants Jones, Williams, Drew, and Stogner were engaged in a discretionary function when they allegedly violated the plaintiffs' constitutional and statutory rights—as we note that the plaintiffs failed to raise the issue before the district court;

20

therefore, the issue is not properly before us. See Johnson v. United States, 340 F.3d 1219, 1228 n. 8 (11th Cir. 2003) ("Arguments not raised in the district court are waived."); Hurley v. Moore, 233 F.3d 1295, 1297–98 (11th Cir. 2000) (same).

Resolving the second and third issues, on the other hand, requires extended discussion. Our task is to determine whether the defendants' actions violated Kelley, Bryant, and Drake's federal rights, and, if so, whether those rights were clearly established. See Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003). We understand the defendants to argue that they are entitled to qualified immunity because, as a matter of law, Kelley, Bryant, and Drake failed to present sufficient evidence to establish that their federal rights to be free from racial discrimination in their employment were violated. Specifically, the defendants aver that Kelley, Bryant, and Drake failed to make out a hostile work environment claim and that Kelley failed to establish her constructive discharge claim. We turn first to the hostile work environment claims.

## 2.

To establish a hostile work environment claim under the Equal Protection Clause and 42 U.S.C. § 1981, an employee (or former employee) must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [his or her] employment." Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S. Ct.

21

2342, 2347, 159 L. Ed. 2d 204 (2004).   This requires that the employee prove the

following:

> (1) that he [or she] belongs to a protected group; (2) that he [or she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).[20]

The defendants concede the first element and focus on the next three,

arguing that Kelley, Bryant, and Drake failed, as a matter of law, to show that the

harassment they experienced, if any, "was sufficiently severe or pervasive to alter

the terms and conditions of employment and create a discriminatorily abusive

working environment."  Id.

As we noted in Miller, this element contains both subjective and objective

components; that is, "to be actionable, [the harassment] must result in both an

---

[20]  We pause to note that discrimination claims, including hostile work environment claims, brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework.  Tademy v. Union Pacific Corp., 520 F.3d 1149, 1170 (10th Cir. 2008) (citations omitted) ("The elements of a hostile work environment claim under § 1981 are the same as those under Title VII."); Cross v. Alabama, 49 F.3d 1490, 1507–08 (11th Cir. 1995) (noting, in the context of evaluating the merits of an equal protection claim, that "[w]hen section 1983 is used as a parallel remedy for [a] violation of . . . Title VII . . ., the elements of the two causes of action are the same.").

environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] to be abusive." Miller, 277 F.3d at 1276 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S. Ct. 367, 370–71, 126 L. Ed. 2d 295 (1993)). Because defendants advance no argument concerning whether Kelley, Bryant, and Drake subjectively believed they were suffering abuse on account of their race, we focus on the objective component of the inquiry.

While it is true that the objective element is not subject to mathematical precision, we can infer that an environment is "hostile" or "abusive" from the circumstantial facts viewed in their proper context. Harris, 510 U.S. at 21–22, 114 S. Ct. at 370–71. This requires that we look to factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S. Ct. at 371; see also Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997).

The plaintiffs presented evidence that Jones, upon taking office, boldly implemented a plan to create a "darker administration" by refusing to hire whites for open managerial positions, demoting or transferring already employed white managers, and filling the positions they had been occupying with blacks. Jones,

23

employing the assistance of Drew, Williams, and Stogner, targeted Kelley, Bryant, and Drake and endeavored to force them out of their positions by adversely altering their job responsibilities and otherwise undermining their authority. The record contains several examples of the tactics Jones and his subordinates used.

On several occasions, Jones angrily confronted Kelley. On one occasion, he approached her in a physically threatening manner. Following this incident, Kelley was forbidden to speak to the press or to communicate with the Board of Commissioners, even though this was part of her job as Director of the Parks Department. Jones stripped Kelley of her hiring authority, requiring her to interview candidates for vacancies with Williams. After she and Williams conducted interviews for the position of Deputy Director of Recreation Services, Williams ignored her suggestion that a white male should be chosen because Jones wanted an African American in the position, irrespective of qualifications. After complaining about the manner in which she was being treated, Stogner told Kelley that she failed to comprehend the overall political environment and could not understand or relate to "powerful black men." Signaling Jones's intention to replace her with a black manager, Stogner told Kelley that Jones wanted "to showcase black parks and black employees." Eventually, Kelley was demoted (and subsequently replaced by Drew) and reassigned to the county's Greenspace

24

program, where her responsibilities were further curtailed. She ultimately resigned.

Bryant showed that Drew, after Jones installed her as Director of the Parks Department, openly treated him differently from black employees. Drew's actions were assuredly in accordance with Jones's diktat to force out and replace white managers with African American managers. The record indicates that Drew (1) excluded Bryant from meetings and declined to allow him input into matters for which he was responsible, while seeking increased input from African American managers; (2) failed to provide him adequate support staff and equipment to perform his job; and (3) required white managers to make appointments to speak with her, while maintaining an open-door policy for African American managers. In addition, on several occasions, Drew drafted letters stating that Bryant was being terminated or suspended and left them in plain view so that Bryant and other employees could see them. Drew, however, never submitted the letters to Human Resources or delivered them to Bryant.

Jones precluded Drake from applying for the position of Director of the Parks Department because Jones had made "too many political commitments." Presumably, this meant that Jones had made too many commitments to the black community to permit a white person to occupy the position. Stogner told Drake

25

that his primary duty while in the Parks Department, was to "prop up" Drew.

Also, Drew, in keeping with Jones's policy, removed Drake from his responsibilities as Assistant Director of the Parks Department and assigned him to perform the duties of a lower-level deputy director. Drew also (1) told department deputy directors to report to her, rather than Drake; (2) removed Drake as the Park Department's representative to the bond program, of which he had been a member since 1986; (3) prevented him from speaking to the media; and (4) excluded him from having any input into the Department's operations.

We find that these facts establish a pattern of harassing behavior "sufficiently severe or pervasive to alter the conditions of [the plaintiffs'] employment." Suders, 542 U.S. at 133, 124 S. Ct. at 2347.

3.

We likewise find, based on the facts as stated in part II.A.2, supra, that Kelley has established her constructive discharge claim against defendants Jones, Williams, and Stogner.[21] "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby

_____

[21] The district court granted Drew's motion for summary judgment with respect to Kelley's constructive discharge claim on grounds that there was an insufficient causal nexus between Drew's actions and Kelley's constructive discharge. See Bryant, 464 F. Supp. 2d at 1309.

26

forces him to quit his job." Munday v. Waste Mgmt. of North America, Inc., 126

F.3d 239, 244 (4th Cir. 1997); accord Young v. Southwestern Savings and Loan

Ass'n, 509 F.2d 140, 144 (5th Cir. 1975) ("The general rule is that if the employer

deliberately makes an employee's working conditions so intolerable that the

employee is forced into an involuntary resignation, then the employer has

encompassed a constructive discharge and is as liable for any illegal conduct

involved therein as if it had formally discharged the aggrieved employee.").[22]  A

plaintiff must show "the work environment and conditions of employment were so

unbearable that a reasonable person in that person's position would be compelled

to resign." Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1363 (11th Cir.

1994); see also Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th

Cir. 1997); Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th

Cir. 1996).  Establishing a constructive discharge claim is a more onerous task

than establishing a hostile work environment claim. Landgraf v. USI Film Prods.,

968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff

must demonstrate a greater severity or pervasiveness of harassment than the

---

[22] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

27

minimum required to prove a hostile working environment."), aff'd, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994); see also Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316–18 (11th Cir. 1989) (affirming district court's finding that plaintiffs established that they were subjected to a hostile work environment but were not constructively discharged); Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 905–06 (11th Cir. 1988) (same).

"An employer may defend against [a constructive discharge claim] by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of [discrimination], and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Suders, 542 U.S. at 134, 124 S. Ct. at 2347. A defendant cannot avail himself of this defense, however, "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Id. Since Kelley has introduced convincing evidence of a humiliating demotion in this case, Defendants may not assert this defense.

Although we are careful not to gild the lily, Kelley has introduced shocking evidence of an overt and unabashed pattern of discrimination. Jones was abusive

28

to Kelley on numerous occasions, including an interaction where he appeared ready to assault Kelley physically. Additionally, from Williams's refusal to hire a white candidate, to Stogner's condescending and racially charged comments that Kelley couldn't relate to black men or that she was too ignorant or idealistic to understand racial politics in DeKalb County, it was clear that Kelley was not welcome to continue working for DeKalb County on account of her being white, and a reasonable person in her position would have had no choice but to resign. See Virgo, 30 F.3d at 1363. Kelley has, accordingly, established her claim.

4.

Although Kelley, Bryant, and Drake provided sufficient evidence to satisfy the "severe and pervasive" element of the hostile work environment claim, and Kelley has successfully made out a case of constructive discharge, Jones argues that the district court erred in concluding that he could be held accountable in his supervisory capacity for the alleged discrimination. In other words, he claims that the court erred in finding that his actions were a proximate cause of the hostile work environment alleged by Kelley, Bryant, and Drake, and of Kelley's constructive discharge. We disagree.

It is well established that liability in § 1983 cases cannot be premised solely upon a theory of respondeat superior. Crawford v. Carroll, 529 F.3d 961, 978

29

(11th Cir. 2008); Braddy v. Florida Dep't of Labor & Employment Security, 133 F.3d 797, 801 (11th Cir. 1998). In Brown v. Crawford, 906 F.2d 667 (11th Cir. 1990), we observed that supervisory liability

> occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

Id. at 671. Additionally, a "supervisor" is not merely a person who possesses authority to oversee plaintiff's job performance but a person with the power directly to affect the terms and conditions of the plaintiff's employment. See Andonissamy v. Hewlett-Packard Co., 547 F.3d 841, 848 (7th Cir. 2008).

The evidence before the district court established that Jones contrived a broad plan to eliminate white managers and replace them with black managers so as to create a "darker administration." As a means of implementing this scheme, Jones and his administration would "eliminate" the white managers' positions rather than simply firing the white managers. His discriminatory intent was further made plain by his open expressions of racial animus, calling Bryant a "white bastard" and declaring that he wanted to terminate Kelley because he felt

30

she let "whites" control the parks. Furthermore, his assertion that his actions were unconnected to Kelley's constructive discharge claim, considering that he issued the executive order that stripped her of her position as Director of the Parks Department, is especially farcical. In sum, this evidence showed compellingly that Jones, as the CEO, was the architect of a racially discriminatory scheme, a scheme that was designed to produce the overt discrimination the plaintiffs suffered. Unquestionably, he spawned the claims the plaintiffs have brought against him.

B.

Having found that Kelley, Bryant, and Drake presented evidence sufficient to sustain their several claims, we take the next step in the qualified immunity analysis and determine whether their rights to be free of the sort of discrimination they endured were clearly established at the time of the defendants' discriminatory acts. See Wood, 323 F.3d at 877–78. We have often noted the "patently obvious illegality of racial discrimination in public employment." Smith v. Lomax, 45 F.3d 402, 407 (11th Cir. 1995); see also Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1064 (11th Cir. 1992) (finding it beyond question that laws proscribing intentional race discrimination in the work place were clearly established); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1478 (11th Cir. 1991) (same). The

defendants argue, however, that since specific plaintiffs failed to file complaints concerning the specific discriminatory acts that occurred, they were not afforded adequate notice that their behavior was unlawful.  This argument is meritless.

In Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), the Supreme Court eliminated any subjective feature of its test for qualified immunity, finding that considerations of the official's state of mind while committing the allegedly unlawful acts have proven incompatible with its "admonition . . . that insubstantial claims should not proceed to trial."  Id. at 815–16, 102 S. Ct. at 2737.  This is so because individualized questions concerning an official's state of mind are inherently fact-based and are thus inappropriate for resolution on summary judgment.  See id. at 816, 102 S. Ct. at 2737.  Accordingly, the question is not whether the defendants actually knew, or should have known, that their actions were unlawful, but, rather, whether reasonable officials occupying their positions would have known that their actions were unlawful.  Id. at 818, 102 S. Ct. at 2738.  Because a reasonable official would have known that discriminating against county managers on account of their race was unlawful, the district court ruled correctly in denying the defendants qualified immunity.

## III.

We turn now to Lowe's claim that Stogner and Drew retaliated against him for refusing to participate in the achievement of Jones's discriminatory goal. Lowe contends that he was discriminated against on account of his race because, as an African American, he refused to go along with Jones's plan.[23] As a starting point, defendants argue that Lowe's claim fails because 42 U.S.C. § 1981(a) does not provide a private right of action for retaliation. The Supreme Court recently dispensed with this argument in CBOCS West, Inc. v. Humphries, ___ U.S. ___, 128 S. Ct. 1951, 1961, 170 L. Ed. 2d 864 (2008), finding that "42 U.S.C. § 1981 encompasses claims of retaliation."[24] Recognizing that Lowe has a private right of action, we consider the merits of defendants' other affirmative defenses.

## A.

Stogner and Drew first assert that the district court erred by concluding that Lowe's retaliation claim was not precluded by the earlier administrative adjudication of his claim. They stress that Lowe was afforded an administrative

---

[23] Lowe also brought his retaliation claim against Jones, but the district court dismissed the claim as to Jones on legislative immunity grounds.

[24] Moreover, and as the Court observed in CBOCS West, Inc. v. Humphries, several courts of appeals, including this court in Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1411–13 (11th Cir. 1998), had reached the same conclusion—that § 1981 encompasses claims of retaliation. Humphries, ___ U.S. at ___, 128 S. Ct. at 1957.

33

hearing to allow him to challenge the elimination of his position, and, because the

hearing officer issued a ruling adverse to him, Lowe is barred from relitigating the

issue. Lowe's response is two-fold. First, he argues the preclusion issue cannot

be raised here because the district court denied the defendants' motion to certify

the issue for appellate review pursuant to 28 U.S.C. § 1292(b). Second, even if the

issue is properly before this court, the district court was correct in holding that it

was not bound by the administrative decision because the retaliation issue was not

before the hearing officer.

After the district court rejected their qualified immunity defenses, Stogner

and Drew moved the court, pursuant to 28 U.S.C. § 1292(b),[25] to enter an order

certifying for appellate review the issue of whether Lowe's retaliation claim was

barred by the administrative adjudication. The district court denied the motion.

Although the district court declined to certify the issue, we may nevertheless

exercise pendent appellate jurisdiction and consider it so long as the issue is

---

[25] 28 U.S.C. § 1292(b) provides:

When a district judge, in making in a civil action an order not otherwise
appealable under this section, shall be of the opinion that such order involves a
controlling question of law as to which there is substantial ground for difference
of opinion and that an immediate appeal from the order may materially advance
the ultimate termination of the litigation, he shall so state in writing in such order.

"inextricably intertwined with an appealable decision or when review of the former decision is necessary to ensure meaningful review of the latter." Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 177 F.3d 1212, 1221 (11th Cir. 1999) (internal quotation marks omitted). Exercising pendent jurisdiction over the preclusion issue is warranted in this case. The issue is "inextricably intertwined" with the qualified immunity issues because resolution of the preclusion issue in favor of the defendants will necessarily dispense of any need to pass on the immunity issues. Also, if we decline to decide the preclusion issue and later find that the defendants are not entitled to qualified immunity, Lowe's retaliation claim will proceed to trial. If a jury finds in favor of Lowe and, on appeal from final judgment, we hold that Lowe was procedurally barred from bringing his claim, our interlocutory review of the qualified immunity issue will be rendered nugatory, thereby frustrating the interests of judicial economy. See Schmelz v. Monroe County, 954 F.2d 1540, 1543 (11th Cir. 1992) (per curiam) (exercising pendent appellate jurisdiction over merits of case along with qualified immunity question so as to dispense with all federal issues).

Satisfied that the preclusion issue is properly before us, we proceed to the question of whether Lowe's claim is barred by the decision of the DeKalb County administrative adjudication. In Travers v. Jones, 323 F.3d 1294 (11th Cir. 2003),

35

we encountered this very issue. In <u>Travers</u>, the plaintiff appealed his thirty-day suspension from the fire department for insubordination and unbecoming conduct during a demonstration in which he engaged his superiors in a heated verbal exchange. A hearing officer upheld the suspension after finding that the facts surrounding the events "did not indicate any non-job-related factor or any errors of fact" warranting reversal of the suspension. <u>Id.</u> at 1296. The plaintiff then brought suit in federal court claiming he had been disciplined for engaging in protected union activity and that his First and Fourteenth Amendment rights were violated. On appeal, we found that the plaintiff was bound by the hearing officer's findings. We concluded that the findings were binding because "the employee received a full and fair opportunity to present his case in the administrative hearing." <u>Id.</u> We went on to explain that "[w]hen a state agency, acting in a judicial capacity, resolves disputed issues of fact properly before it that the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's court." <u>Id.</u>

The facts of this case, however, distinguish it from <u>Travers</u>. The record shows that, under DeKalb County's administrative procedures, Lowe could only appeal the decision of the Board of Commissioners to eliminate his job by arguing

36

that the Commissioners could not establish a lack of funding or lack of work to justify their decision.[26] Lowe could not challenge the underlying discriminatory conduct he contends was the fountainhead of his termination because the hearing officer lacked the authority to consider that issue. Moreover, the hearing officer made very narrow and perfunctory factual findings tailored solely around his limited jurisdiction. His findings were as follows:

> The undersigned finds, in the instant case, that, in fact, the DeKalb County Board of Commissioners voted not to appropriate funding for the position of Deputy Director, Strategic Management, Park[s] and Recreation Department.

Plainly, the issue before the hearing officer was distinct from the issue presented to the district court, which was not whether Lowe's job was eliminated because of a true shortage of funding but whether Lowe's job was abolished in retaliation for his refusal to participate in a scheme to discriminate against white managers. Furthermore, aside from the administrative adjudication bar, traditional concepts of collateral estoppel, or issue preclusion, do not bind this court. Collateral estoppel's operation requires that (1) an identical issue was presented in the prior proceeding; (2) the issue was a critical and necessary part of the prior

---

[26] Under Personnel Code of DeKalb County § 20-195, a hearing officer's authority is limited to deciding "whether the dismissal was in fact due to lack of work, lack of funds, lack of appropriation of funds, abolishment of the position or for other material changes in the duties of the position or the organization of the department."

proceeding; (3) the issue was fully and fairly litigated in the previous proceeding; (4) the parties in the two proceedings were identical; and (5) a final decision was rendered by a court of competent jurisdiction. See Wingard v. Emerald Venture Fla. LLC, 438 F.3d 1288, 1293 (11th Cir. 2006); see generally Brown v. R.J. Reynolds Tobacco Co., 576 F. Supp. 2d 1328, 1340–41 (M.D. Fla. 2008). On their face, the hearing officer's findings relate solely to the issue of whether the Board of Commissioners voted to abolish Lowe's job. Therefore, Lowe's retaliation claim is not barred, as the administrative adjudication did not dispose of the allegations and arguments underpinning Lowe's retaliation claim.

## B.

For his part, Stogner argues that the district court erred in failing to grant him absolute legislative immunity for developing the 2004 budget, which provided for the elimination of Lowe's position as Deputy Director of Strategic Management and Development of the Parks Department.[27] Lowe, in response, argues that Stogner was not engaging in legitimate legislative activities when crafting the 2004 budget with respect to Lowe's position. Instead, according to Lowe, Stogner used the proposed budget as an artifice for what was in fact a

---

[27] Denials of legislative immunity are subject to de novo review. Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1060 (11th Cir. 1992).

38

retaliatory personnel decision.[28]  In resolving this matter, we bifurcate our analysis by first examining the broad principles underlying legislative immunity and then considering their application to the case before us.

1.

The Speech or Debate Clause of our Constitution provides that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other place."  U.S. Const. art. I, § 6, cl. 1.  By its terms, the Clause is limited to members of Congress.  See Lake Country Estates v. Tahoe Regional Planning Agency, 440 U.S. 391, 404, 99 S. Ct. 1171, 1179, 59 L. Ed. 2d 401 (1979).  Nevertheless, state and local legislators, and their surrogates, enjoy a parallel immunity from civil liability for their legislative acts.  See Gravel v. United States, 408 U.S. 606, 618, 92 S. Ct. 2614, 2623, 33 L. Ed. 2d 583 (1972).[29]

---

[28]  We possess jurisdiction to review the district court's rejection of Stogner's claim of legislative immunity under the "collateral order" doctrine of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949).  Nixon v. Fitzgerald, 457 U.S. 731, 102 S. Ct. 2690, 73 L. Ed. 2d 349 (1982) (authorizing immediate appellate review of a denial of legislative immunity); see supra note 2; see also Harris v. Deveaux, 780 F.2d 911, 913 (11th Cir. 1986) ("Absolute immunity is meant to protect not only from liability, but from going to trial at all.").

[29]  We have recognized that "efficient operation of contemporary government necessitates adjuncts performing responsibilities traditionally executed by the legislators."  Ellis v. Coffee County Bd. of Registrars, 981 F.2d 1185, 1194 (11th Cir. 1993); see also Gravel, 408 U.S. at 616–17, 92 S. Ct. at 2623 ("[I]t is literally impossible, in view of the complexities of the modern legislative process, with . . . matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be

Doctrinally, legislative immunity emanates from the well-spring of the federal common law; nevertheless, it is similar in scope and object to the immunity provided federal legislators under the Speech or Debate Clause. Indeed, when the Supreme Court initially recognized state legislative immunity as a constituent of the federal common law, it looked to its Speech or Debate Clause jurisprudence for guidance anent the contours of the doctrine. See Tenney v. Brandhove, 341 U.S. 367, 376–79, 71 S. Ct. 783, 788–90, 95 L. Ed. 1019 (1951). In later decisions, the Court acknowledged that the legislative immunity federal and state legislators enjoy are essentially coterminous. See Supreme Court of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 732–33, 100 S. Ct. 1967, 1974–75, 64 L. Ed. 2d 641 (1980). By analogy, these principles afford legislators at the regional level similar protection to the extent they act in a capacity comparable to that of state legislators. See Lake Country Estates, Inc., 440 U.S. at 404, 99 S. Ct. at 1179; Ellis, 981 F.2d at 1194. Furthermore, in this circuit, we have extended this immunity to local legislators, Woods v. Gamel, 132 F.3d 1417, 1419 (11th Cir. 1998) (citing Hernandez v. City of Lafayette, 643 F.2d 1188, 1193 (5th Cir. Unit A May 1981), and their adjuncts, see Ellis, 981 F.2d at 1192.

------

treated as the latter's alter egos . . . .").

40

Hence, our consideration of Stogner's legislative immunity claim begins with a distillation of principles extracted from federal constitutional jurisprudence.

The Speech or Debate Clause finds its origin in a similar provision of the English Bill of Rights of 1689.[30]  See Tenney, 341 U.S. at 372, 71 S. Ct. at 786; United States v. Johnson, 383 U.S. 169, 177–78, 86 S. Ct. 749, 753–54, 15 L. Ed. 2d 681 (1966).  The Clause is designed to reinforce the independence of the legislative branch and ensure that it will be able to perform the whole of the legislative function ceded to it by the Constitution free of undue interference.  See Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 502, 95 S. Ct. 1813, 1820, 44 L. Ed. 2d 324 (1975).  To that end, the Clause protects officials "from inquiry into legislative acts or the motivation for actual performance of legislative acts," United States v. Brewster, 408 U.S. 501, 509, 92 S. Ct. 2531, 2536, 33 L. Ed. 2d 507 (1972), "from the burden of defending" certain suits, Dombrowski v. Eastland, 387 U.S. 82, 85, 87 S. Ct. 1425, 1427, 18 L. Ed. 2d 577 (1967) (per curiam), and "from the consequences of litigation's results," id.; see generally

---

[30] The English version provides: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 Wm. & Mary, Sess. 2, ch. II (1689) (quoted in Tenney, 341 U.S. at 373, 71 S. Ct. at 786).  For thorough expositions on the historical antecedents of the Clause, see Justice Frankfurter's majority opinion in Tenney, 341 U.S. at 372–75, 71 S. Ct. at 786–87, and Justice Harlan's opinion for the Court in Johnson, 383 U.S. at 177–83, 86 S. Ct. at 753–57.

Consumers Union, 446 U.S. at 731–32,100 S. Ct. at 1974, Eastland, 421 U.S. at 502–03, 95 S. Ct. at 1820–21; Johnson, 383 U.S. at 179, 86 S. Ct. at 755.

While the Court has given the Clause broad application, its protections are carefully tailored to its purposes. See Eastland, 421 U.S. at 501–02, 95 S. Ct. at 1820–21. Officials claiming protection "must show that such immunity is justified for the governmental function at issue." Hafer v. Melo, 502 U.S. 21, 28–29, 112 S. Ct. 358, 363, 116 L. Ed. 2d 301 (1991). Accordingly, the privilege enures only to legislators engaging in actions considered "an integral part of the deliberative and communicative processes by which [legislators] participate in . . . proceedings with respect to the consideration and passage or rejection of proposed legislation." Smith v. Lomax, 45 F.3d 402, 405 (11th Cir. 1995) (quoting Gravel, 408 U.S. at 625, 92 S. Ct. at 2627) (alteration in original). The Clause does not confer absolute immunity "simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." Brewster, 408 U.S. at 507, 92 S. Ct. at 2535.

2.

Turning to the matter here, Stogner initially asserts that the district court's analysis is flawed because it improperly focused on his position as Executive

42

Assistant to the Chief Executive Officer (Jones).[31] We agree. In basing its denial

of legislative immunity to Stogner on the fact that he "is not an officer or

employee of a legislative body" but, rather, "an executive assistant of someone

who is serving in an executive position," the district court erred by grounding its

decision on Stogner's title rather than upon the function in which he was engaged

that gave rise to Lowe's claim. Because the applicability of legislative immunity

necessarily focuses on particular acts or functions, not on particular actors or

functionaries, immunity also extends to legislative acts performed by executive

officials and other non-legislators. See Eastland, 421 U.S. at 507, 95 S. Ct. at

1823 (declining to draw a distinction between the members of a congressional

subcommittee and the subcommittee's counsel when the latter's actions were

within the sphere of legitimate legislative activity); Gravel, 408 U.S. at 618, 92 S.

Ct. at 2623 (holding that "the Speech or Debate Clause applies not only to a

Member but also to his aides insofar as the conduct of the latter would be a

protected legislative act if performed by the Member himself."). To be sure, when

determining entitlement to the immunity, the position held by the official seeking

immunity is not dispositive, as the "immunity is justified and defined by the

---

[31] The district court found that Jones was entitled to legislative immunity because he introduced the 2004 budget proposal to the Board of Commissioners.

functions it protects and serves, not by the person to whom it attaches." Forrester v. White, 484 U.S. 219, 227, 108 S. Ct. 538, 544, 98 L. Ed. 2d 555 (1988) (emphasis in original); see Yeldell, 956 F.2d at 1062 ("It is the nature of the act which determines whether legislative immunity shields the individual from suit.").

By preparing the 2004 budget proposal, which Jones approved and submitted to the Board of Commissioners, Stogner argues that he necessarily acted in a legislative capacity and is deserving of absolute immunity. As part of his argument, Stogner seeks to have us adopt a per se rule that would provide an executive official immunity any time he drafts a proposal that is later submitted to a legislative body. We decline to adopt such a rule as it cuts too broadly and is inapposite to the principle that our inquiry is not bound by officials' titles and the characterizations officials place on their own activities. Instead, we examine the facts of each case to determine "whether the [official] in the instant case [was] engaging in legislative activity." Espanola Way Corp. v. Meyerson, 690 F.2d 827, 829 (11th Cir. 1982), cert. denied, 460 U.S. 1039, 103 S. Ct. 1431, 75 L. Ed. 2d 791 (1983).

We now evaluate whether Stogner was engaging in legitimate legislative activity when he developed and drafted the 2004 budget, which eliminated Lowe's position. In doing so, we are careful to limit our decision to this narrow issue and

44

decide "only what is necessary to the disposition of the immediate case." Whitehouse v. Ill. Cent. R.R. Co., 349 U.S. 366, 373, 75 S. Ct. 845, 850, 99 L. Ed. 1155 (1955). Generally, absolute immunity applies to "prospective, legislative-type rules" that have general application. See Alexander v. Holden, 66 F.3d 62, 67 (4th Cir. 1995). "Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process." Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 8 (1st Cir. 2000) (internal quotations omitted).

Relying on Bogan v. Scott-Harris, 523 U.S. 44, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998), Stogner characterizes his behavior as a legitimate legislative act by virtue of his developing and drafting the budget proposal that was later adopted by the Board of Commissioners. Implicit within this characterization is the assertion that the elimination of Lowe's position (Deputy Director of Strategic Management and Development Parks and Recreation Department) arose out of broad policy and budget considerations and did not stem from specific facts as they related to Lowe. We agree.

In Bogan, the plaintiff alleged that her discharge, which was accomplished through an ordinance eliminating a city department (of which she was the sole

45

employee), was motivated by racial animus and was in retaliation for filing a complaint against another employee who had used racial and ethnic slurs. 523 U.S. at 46–47, 118 S. Ct. at 969. The Supreme Court found that absolute immunity should apply because the ordinance "bore all the hallmarks of traditional legislation." Id. at 55, 118 S. Ct. at 973. According to the Court, the ordinance "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city," and it had prospective impact because it eliminated a department rather than a single employee. Id. at 55–56, 118 S. Ct. at 973. Put differently, the alleged retaliation had a substantial nexus to the legislative process.

Lowe, however, attempts to cast this case as merely an employment action masked by the legislative process. He argues that legislative immunity is unavailable where, as here, the legislation adversely impacted a single individual. The argument is unavailing. Ordinarily, the decision to terminate an individual's employment is characterized as an administrative action, see In re Montgomery County, 215 F.3d 367, 376 (3d Cir. 2000) (finding the decision to eliminate a particular employee rather than employee's position constitutes an administrative, rather than legislative act); Acevedo-Garcia, 204 F.3d at 8 (holding that selective layoffs of particular employees do not constitute legislative acts); Canary v.

46

Osborn, 211 F.3d 324, 330–31 (6th Cir. 2000) (same), but Lowe's employment was not terminated in this case. The Board of Commissioners chose to adopt the 2004 budget, which abolished the position of Deputy Director of Strategic Management and Development, Parks and Recreation Department. This distinction proves dispositive.

Unlike employee personnel decisions, the elimination of a public employment position does constitute a legislative act. In Bogan, the Supreme Court noted that the elimination of a public employment position—as compared to the firing of a single individual—is a quintessential legislative act. See Bogan, 523 U.S. at 55–56, 118 S. Ct. at 973. Unlike the termination of an individual employee, the elimination of a public employment position "may have prospective implications that reach well beyond the particular occupant of the office." Id. at 56, 118 S. Ct. at 973. Here, the decision to abolish the position—and Stogner's involvement in preparing the budget proposal—is properly construed as embodying a policy decision with prospective implications.

Lowe further argues that legislative immunity does not attach to Stogner because Stogner developed the 2004 budget as a continuation of Jones's racially discriminatory policy to eliminate managers through reorganizations rather than firings. Lowe notes that prior to his developing and drafting the 2004 budget

proposal, Drew had hired Billups into the exact position Lowe held. And for approximately five months, Billups performed the same job functions. Then, by sleight of hand, Billups was given another job title while still performing the same functions as Lowe, thereby rendering Lowe's position and title unnecessary. Lowe also points out that, of 600 positions in the Parks Department, his position was the only one eliminated. This, according to Lowe, demonstrated that Stogner's actions were not directed at legitimate legislative goals but, rather, were aimed at punishing him for refusing to participate in Jones's scheme to eliminate white managers.

While these facts obviously suggest an improper motive, "[t]he claim of an unworthy purpose does not destroy the privilege." Tenney, 341 U.S. at 377, 71 S. Ct. at 788. Surely, the privilege "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." Id. Moreover, it simply is "not consonant with our scheme of government for a court to inquire into the motives of legislators." Id. Therefore, we need not examine Stogner's motives in drafting the 2004 budget, as the inquiry is simply "whether, stripped of all considerations of intent and motive, [Stogner's] actions were legislative." Bogan, 523 U.S. at 55, 118 S.

Ct. at 973.

In fine, we find that Stogner is entitled to absolute legislative immunity against any claims, including Lowe's retaliation claim, arising from actions directly related to his preparing and drafting the 2004 budget proposal.

C.

Having found that Stogner possesses legislative immunity with respect to Lowe's retaliation claim, we next consider whether Drew is entitled to qualified immunity regarding that claim. We begin by noting that, since Lowe failed to raise in the district court the issue of whether Drew was performing a discretionary function when committing the discriminatory acts, the issue is not before us. See Johnson, 340 F.3d at 1228 n.8. Turning to the qualified immunity question, we first look to whether Lowe has established a violation of his statutory or constitutional rights. Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, we employ the tripartite analytical framework developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and subsequently modified in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). See Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S. Ct. 2363, 2377–78, 105 L. Ed. 2d 132 (1989)

49

superceded in part by Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1071–72 (codified at 42 U.S.C. § 1981); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same [McDonnell Douglas/Burdine] analytical framework" ).  Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action.  Raney v. Vinson Guard Serv. Inc., 120 F.3d 1192, 1196 (11th Cir. 1997); Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  These three elements create a presumption that the adverse action was the product of an intent to retaliate.  Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action.  See Goldsmith, 996 F.2d at 1163.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted," Burdine, 450 U.S. at 255, 101 S. Ct.  at 1094–95, and "drops from the case," id. at 255 n.10, 101 S. Ct. at 1095 n.10.  After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason

was merely a pretext to mask discriminatory actions. See Raney, 120 F.3d at 1196.

Initially, Drew argues that the district court erred by finding she waived any argument on summary judgment that Lowe failed to establish a prima facie case of retaliation because she failed to develop the argument in her motion for summary judgment until filing her reply brief. Drew asserts that, by stating the elements of the required prima facie showing in her initial summary judgment pleading, she preserved the argument. We disagree. It is well established in this circuit that, absent extraordinary circumstances, legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal. See, e.g., Millennium Partners, L.P. v. Colmer Storage, LLC, 494 F.3d 1293, 1304 (11th Cir. 2007); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1256 n.6 (11th Cir. 2005). An insignificant recitation of black letter law is not tantamount to raising an issue for adjudication. Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (finding that a party waives an issue by failing to make any substantive arguments with respect to that issue). Thus, Drew is procedurally barred from raising the issue on appeal and has conceded any argument that Lowe failed to establish a prima facie case of retaliation.

Drew also argues that Lowe failed to present evidence capable of establishing that her non-discriminatory explanation for recommending the abolishment of Lowe's position was pretextual. Before the district court, Drew explained that she recommended that Lowe's position be eliminated because it was no longer needed and other employees were performing duties originally assigned to it. To establish that Drew's explanation was merely a pretext for discrimination, Lowe had to "present concrete evidence in the form of specific facts which show[ed] that the defendant's proffered reason [was] mere pretext. Mere conclusory allegations and assertions w[ould] not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

As the district court noted, the "complicated assignment process" suggested that Drew's explanation was pretextual. After Lowe refused to be a "team player," Drew moved his office to the same floor as Jones's office, presumably so that Jones could monitor Lowe's activities. Jones again told Lowe that if he wanted to work for DeKalb County, he would have to become a "team player." Because Lowe continued to refuse to participate in Jones's plan, Drew hired Billups into the same position as Lowe's and gave him duties once assigned to Lowe. Although Lowe and Billups continued to perform the same duties, Drew changed Billups's job title to Deputy Director of Recreation Services. Drew then

recommended to Stogner that Lowe's position be abolished, and the 2004 budget provided for its abolition. These facts suggest that Drew participated in a scheme to make Lowe's position redundant and effectively terminate him because he refused to participate in Jones's plan to eliminate white managers.

Drew next argues that her alleged acts of retaliation did not violate clearly established law because the availability of a claim for retaliation brought under 42 U.S.C. § 1981 was not well-established. Drew contends that the district court's error lies in its finding that the right to be free from discriminatory retaliation was clearly established under Title VII and its failing to consider whether the right also was clearly established under § 1981. Therefore, according to Drew, because Lowe's claim is grounded in § 1981, any reliance the district court placed on Title VII cases for the proposition that a discriminatory retaliation cause of action was clearly established under § 1981 was error. This argument strains credulity.

The Supreme Court has explained that a constitutional right is "clearly established" when the "contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987). Under this standard, a plaintiff need not show that the government official's conduct specifically has been held unlawful, but rather that "in the light

53

of pre-existing law the unlawfulness [was] apparent." Id. Amplifying this principle, the Court noted that "'general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997)) (internal citation omitted; alteration in original). This precedent makes clear that a right may be clearly established irrespective of whether courts have specifically deemed the cause of action as being available under a particular legal theory. Accordingly, the question is not whether a reasonable officer would know that a discriminatory retaliation claim was available under Title VII or § 1981; rather, the salient question is whether the state of the law at the time provided officials fair warning that their discriminatory retaliatory conduct was unlawful. See Hope, 536 U.S. at 741, 122 S. Ct. at 2516.

Furthermore, even if Drew's misguided interpretation of the "clearly established" prong of the qualified immunity test was correct, it is well-established in this circuit that claims for retaliation are cognizable pursuant to § 1981. See

54

Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1212–13 (11th Cir. 2008);

Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008); Jackson

v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1279 (11th Cir. 2005); Andrews v.

Lakeshore Rehab. Hosp., 140 F.3d 1405, 1411–13 (11th Cir. 1998); Jackson v.

Motel 6 Multipurpose, Inc., 130 F.3d 999, 1007 (11th Cir. 1997).[32]  Consequently,

Drew may not find shelter under the doctrine of qualified immunity.[33]

## IV.

For the reasons stated above, the judgment of the district court is

REVERSED, to the extent it denied Stogner legislative immunity.  The judgment

of the district court is AFFIRMED in all other respects.  The case is REMANDED

---

[32] We further reject Drew's contention that, since the Supreme Court had not addressed the issue before the alleged discrimination occurred, we cannot find that the right had been clearly established at that time.  We have said that, in the absence of Supreme Court authority, we may look to the decisions of this court when deciding whether the contours of a right have been clearly established.  Marsh v. Butler County, Ala., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc) (finding that, when courts in this Circuit must look to case law in order to discern whether a right has been clearly established, we look to decisions of the U.S. Supreme Court, the Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state).  As the cases in the text reveal, the right to be free from racially motivated retaliation under § 1981 had been clearly established in this circuit when Lowe's discriminatory retaliation claim arose.

[33]  Drew also argues that she cannot be held individually liable because she did not make the ultimate decision to eliminate Lowe's position. This argument misses the point.  Lowe is not bringing a Title VII claim for discriminatory discharge in which he is attempting to impute Drew's racial animus to her employer, DeKalb County, see Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331–32 (11th Cir. 1999) (per curiam); rather, he is bringing a § 1981 claim for retaliation, arguing that Drew actively participated in a scheme to retaliate against him due to his refusal to be a "team player" and assist in discriminating against white managers.

55

for further proceedings not inconsistent with this opinion.

SO ORDERED.

# Appendix

## DeKalb County Government Hierarchy



DeKalb County Chief Executive
Officer ("CEO")

Vernon Jones

Executive Assistant to the
CEO

Richard Stogner

DeKalb County Director
of Human Resources

Joe Stone

Assistant County
Administrator

Morris Williams

Director of Parks Department

Becky Kelly (1992-2002)

Marilyn Boyd Drew (2002-   )

**Assistant Director of Parks Department**

John Drake

---

**Deputy Director of Revenue Management and Support**

Michael Bryant

---

**Deputy Director of Recreation Services**

Marilyn Boyd Drew (2001-2002)

Marvin Billups (2004- )

---

**Deputy Director of Strategic Management and Development**
(position abolished January 27, 2004)

Herbert Lowe

Marvin Billups