[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14480
Non-Argument Calendar
_____

D.C. Docket No. 2:12-cv-03922-RDP

CHARLORIS HAWKINS,

Plaintiff-Appellant,

versus

BBVA COMPASS BANCSHARES, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(June 2, 2015)

Before HULL, ROSENBAUM and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Charloris Hawkins appeals the district court's grant of

summary judgment for Defendant-Appellee BBVA Compass Bancshares, Inc. on

Plaintiff's claims of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and interference and retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.

## I.  Background

Plaintiff Hawkins ("Plaintiff") was hired by BBVA Compass Bancshares ("Defendant") in August 2011 as a Financial Analyst in the Finance Technology ("TeSS") group.  Denis Arauz, Director of Financial Analysis & Planning, made the decision to hire Plaintiff and served as Plaintiff's immediate supervisor throughout her employment.  Arauz reported to Joanna Burleson, Director of TeSS Finance and Control.  During Plaintiff's employment, Arauz directly supervised three other Financial Analysts in addition to Plaintiff:  Tiera Love, whom Arauz later promoted to Finance Manager; Remy Bukelis; and Michael Langan.  Arauz and the Financial Analysts were responsible for variance analyses and forecasting for the TeSS Division, which required coordination within the group and with executives and managers.

From early on in Plaintiff's employment, Arauz and Tiera Love perceived that Plaintiff struggled to accurately, efficiently, and timely complete her job duties.  On December 20, 2011, Arauz issued Plaintiff a verbal warning for accumulating four unapproved absences within a twelve month period, in violation

2

of Defendant's attendance policy.  The next day, Plaintiff challenged the verbal warning with Corie Arnold in Human Resources, arguing that she had received advance approval for one of the absences.  During that meeting, Plaintiff also complained that Arauz used inappropriate language, and as an example, stated that Arauz once commented in a meeting, "Hey, so and so, where's my shit?"  Plaintiff also complained that she perceived her discussions with Arauz as "belittling" and "degrading."

On January 13, 2012, Plaintiff complained to Human Resources again, this time to her primary Human Resources contact, Crystal Berryhill.  Plaintiff complained that Arauz used profanity, was "harsh" and "disrespectful" in his communications, and that "she has asked for help and training, but [] he does not communicate with her or acknowledge her requests until he reprimands her about something she has done wrong."  Later in January, Plaintiff, Arauz, and Burleson met to discuss the issues Plaintiff raised.  According to Berryhill, the issues were resolved, and Plaintiff said that she would reach out to Human Resources again if necessary.

On April 27, 2012, Arauz issued Plaintiff her annual performance evaluation for 2011 and his performance expectations for 2012.  Though Arauz noted some of Plaintiff's deficiencies and areas of needed improvement, he rated Plaintiff's overall performance as "Meeting Expectations."  He explained that he was giving

3

her the benefit of the doubt because she had been employed for less than five months in 2011.  His written comments stated, in part:

> When [there are] time constraints, ambiguous details, and potential problems or conflicts, [Plaintiff] is less effective . . . . It is during this time that [Plaintiff] needs to determine what is lacking to ensure the task gets done . . . . [Plaintiff] needs to understand her business area and ensure that financials are accurately represented . . . . I have seen the potential, however, it is not consistent . . . . [There have been] multiple occasions where things were to a point of no return and communication was stalled . . . . [Plaintiff] should continue to work on this as it is critical to achieving overall success.

After receiving this evaluation, Plaintiff continued to exhibit performance issues.  On May 10, 2012, Human Resources Executive Director Jan Naccari and Arauz decided to issue a written warning to Plaintiff because of her underperformance.  The warning was given to Plaintiff over a month later, on June 22, 2012.  After Defendant had made the decision to issue this written warning, but before it had done so, Plaintiff bid on two internal accounting positions.  Plaintiff was told she could continue to bid on the positions and that Arauz would not block the bids.  However, Arauz indicated that if he was asked, he would explain that Plaintiff had received a written warning.

Plaintiff left work sick on the day she received her written warning, June 22, due to a reported "pseudoseizure"[1] and remained away from work until June 27, 2012.  Upon her return, she responded to the written warning by blaming Arauz for

---

[1] A pseudoseizure is a non-epileptic seizure that is psychological in nature, as opposed to neurologically caused.  *See* http://emedicine.medscape.com/article/1184694-overview.

4

her performance issues because he did not provide her enough guidance and was a poor communicator. Plaintiff also stated that she believed Arauz was retaliating against her because she had complained about him to Human Resources. On July 5, 2012, Arauz, Berryhill, Naccari, Human Resources Partner Tameka Eubanks, and Plaintiff met to discuss the ongoing issues, and it was agreed that Arauz and Plaintiff would meet in person on a regular basis to address any unresolved issues. The record indicates that seventeen of these meetings, some of which lasted over two hours, occurred over the next four weeks. The last meeting took place on August 3, 2012.

After these seventeen meetings, Arauz concluded that Plaintiff did not possess the level of skill or experience she had claimed when applying for the job and that these shortcomings were not solvable given the time-sensitive constraints of the position. In an August 6 memorandum to Burleson and Dan Howard, Human Resources Partner and Senior Vice President, who recently had replaced Naccari as Arauz's primary Human Resources contact, Arauz stated his belief that Plaintiff's employment should be terminated. Alternatively, he stated that he would "like HR to find her a new home."

With input from Arauz, Burleson, and Eubanks, Howard placed Plaintiff on a ninety-day probation for unsatisfactory performance beginning on August 6. The probation document stated that it was "imperative that [Plaintiff] demonstrate

5

immediate, significant, and sustained improvement" and that "[f]ailure to meet these standards of performance can result in further disciplinary counseling, up to and including termination of employment." The next day, Plaintiff submitted a written rebuttal alleging that the probation was retaliatory and denying responsibility for her performance issues.

Immediately after she was placed on probation, Plaintiff was given a narrowly-tailored software maintenance file assignment, which she agreed could be completed and submitted no later than August 9. Plaintiff submitted the assignment on August 9 but left work early that afternoon when she suffered a seizure. Plaintiff was subsequently approved for non-FMLA medical leave and, once she had completed the one-year employment period that is required to become eligible for FMLA leave, she was approved for that leave. The FMLA leave period was approved for August 15 through September 30, 2012, but Plaintiff returned to work on September 11. Notably, although Arauz knew that Plaintiff was suffering from medical problems and was not at work, he did not become aware that Plaintiff had applied for FMLA leave until August 30, when he received an email from Human Resources.

After Plaintiff turned in her assignment, Arauz reviewed it and determined that it contained several of the same types of errors she had been making throughout her employment. Arauz discussed his conclusions with Howard and

6

told Howard he did not think Plaintiff was capable of improving her performance. To ensure that Arauz had accurately assessed Plaintiff's assignment, Howard asked another financial analyst, Robby Odgers, to perform the same assignment. Howard provided Odgers with Plaintiff's work product—without identifying Plaintiff—to see if he could determine how Plaintiff had reached her results. Odgers confirmed that Plaintiff's report was inaccurate, internally inconsistent, and appeared to be prepared by someone who lacked the necessary analytical skills to complete the task. Howard thus decided to meet with Plaintiff upon her return from leave to afford her an opportunity to explain her failure to properly complete the assignment.

On September 11, Plaintiff was cleared by her physician to return to work on a reduced schedule for two weeks, with no restrictions thereafter. That day, Howard and Eubanks met with her about her most recent assignment. No reference to Plaintiff's FMLA leave was made during this meeting. After the meeting, Howard concluded that Plaintiff's performance issues were not resolvable and decided to terminate her employment for unsatisfactory performance. On September 12, Howard and Eubanks met with Plaintiff and notified her of the termination decision. Two male employees, Chris Valencia and Matthew English, assumed her duties.

7

Plaintiff then filed a charge of discrimination with the EEOC, alleging she was discharged because of her gender and that she was subjected to a retaliatory discharge, in violation of both Title VII and the FMLA. She subsequently filed this lawsuit in federal court. The district court granted summary judgment to Defendant on all claims, and Plaintiff filed this timely appeal. After careful review, we affirm.

## II.  Standard of Review

We review a district court's grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). A movant is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.  Title VII Disparate Treatment Claim

Title VII provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). In evaluating disparate treatment claims supported by circumstantial evidence, we use the framework of

8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case, which generally requires showing:  (1) the plaintiff was a member of a protected class; (2) she was qualified to do the job; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably than similarly situated individuals outside her protected class.  *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).  To prove an adverse employment action, the plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

If the plaintiff establishes a prima facie case, the employer then has the burden of production to articulate a legitimate, non-discriminatory reason for its actions.  *Wilson*, 376 F.3d at 1087.  If the employer satisfies its burden, the presumption of discrimination is rebutted, and the plaintiff must then offer evidence that the employer's reason is a pretext for illegal discrimination.  *Id.*

The district court granted summary judgment to Defendant on Plaintiff's disparate treatment claim, finding that Plaintiff's employment termination was the

9

only adverse action it could consider, and that even if any of Defendant's pre-termination decisions were adverse for Title VII purposes, Plaintiff presented no comparator evidence necessary to establish a prima facie case.  Regarding Plaintiff's termination, the district court found that Defendant met its burden of articulating a non-discriminatory reason for terminating Plaintiff's employment, which Plaintiff failed to show was pretextual.  For the following reasons, we affirm.

## A.  Failure to Transfer

Plaintiff argues that Defendant's refusal to transfer her away from the supervision of Denis Arauz was an adverse employment action.  We disagree.  We have held that transferring an employee to a different position can be adverse if it involves a reduction in pay, prestige, or responsibility.  *Doe v. DeKalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1448–49 (11th Cir. 1998); *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).  But, "it is important not to make a federal case out of a transfer that is de minimis, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint."  *Doe*, 245 F.3d at 1453 & n.21.  Here, not even a de minimis transfer is at issue because Plaintiff alleges that it was Defendant's *failure* to transfer her that was the adverse action.  Yet, she obviously suffered no reduction in pay, prestige, or responsibility by remaining in the same position for which she had been hired:  the position of a Financial Analyst.  Nor

10

has she alleged that she would have gained additional pay, prestige, or responsibility in one of the two positions on which she bid. *See Davis*, 245 F.3d at 1239 (a plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment"); *Hinson*, 231 F.3d at 829 ("transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility").

Importantly, Plaintiff does not claim that Defendant failed to promote her. She alleges only that Defendant denied her request to be transferred into a different position. The district court stated that "the failure to allow such a transfer does not constitute a serious and material *change* because there is no change." The district court was correct. We do note, however that requiring an employee to remain in her present position could constitute an adverse action in Title VII failure to promote claims. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (stating prima facie elements for a Title VII failure to promote claim, including that a plaintiff must show she was "qualified for and applied for the *promotion*" and was rejected) (emphasis added). But there is no failure to promote claim at issue here, and Defendant's failure to grant Plaintiff's request for a transfer is not adverse for Title VII purposes.

11

**B. Termination of Employment**

Plaintiff also contends that she was fired because of her gender.  Regarding this claim, the district court assumed that Plaintiff had established a prima facie case.  Defendant's articulated reason for terminating Plaintiff—her ongoing performance issues culminating in the poorly-performed task she submitted while on probation—was a legitimate, non-discriminatory reason.  *Wilson*, 376 F.3d at 1087.  There was ample evidence in the record to support the legitimacy of this reason.  Both Arauz and Plaintiff's coworker, Tiara Love, attested that Plaintiff struggled with the requirement that she accurately, efficiently, and timely complete her job assignments.  Further, after Plaintiff submitted her final assignment, Arauz reviewed it and determined that it contained several errors of the same type she had been committing throughout her employment.  To confirm Arauz's assessment, another analyst reviewed Plaintiff's assignment and agreed that Plaintiff's report was inaccurate, internally inconsistent, and appeared to be prepared by someone who lacked the necessary analytical skills to do the work.  Moreover, the fact that Arauz hired Plaintiff only a year before her discharge undermines the notion that any of his actions toward her were gender-motivated.  *See Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (noting that where same person who hires plaintiff, with knowledge of her protected status, then takes adverse action

12

against her shortly thereafter, an inference may be drawn that the action was not motivated by discriminatory animus).

Plaintiff failed to present evidence that Defendant's stated reason was a pretext for illegal gender discrimination. To show pretext, the plaintiff must cast sufficient doubt on the defendant's proffered non-discriminatory reasons to allow a reasonable factfinder to determine that the proffered "legitimate reasons were not what actually motivated its conduct." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (internal quotations omitted). This requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

Plaintiff has failed to present sufficient evidence of pretext to survive summary judgment. Evidence relating to discriminatory comments, though it can contribute to a circumstantial case for pretext, must be read in conjunction with the entire record and considered with the other evidence in the case. *See Rojas v. Florida*, 285 F.3d 1339, 1342–43 (11th Cir. 2002). The only facts she cites to show pretext are: (1) on five to six occasions, Plaintiff heard Arauz refer to two female coworkers as "bitches" and once he called Plaintiff a "bitch" behind her

back, and (2) Arauz once told Plaintiff she had "mommy brain." Though the district court did not address these comments, the evidence suggests that these were merely isolated comments unrelated to Plaintiff's termination, particularly when considered together with the evidence of Plaintiff's poor performance. *See id.* at 1343 ("Because [the employer's] alleged comment was . . . an isolated comment, unrelated to the decision to fire [the plaintiff], it, alone, is insufficient to establish a material fact on pretext.").

While the evidence to which Plaintiff points includes inappropriate and offensive gender-based remarks that we do not condone, under the totality of the circumstances, it alone is not enough to raise a material issue of fact as to pretext. In order to show that Defendant's proffered reasons for taking adverse employment action were pretextual, Plaintiff must address the employer's proffered legitimate reason "head on and rebut it." *Chapman v. Al Trans.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). In order to do so, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008). Plaintiff made no such showing.

Instead, the evidence amply supports the district court's findings that Defendant's concerns about Plaintiff's job performance were legitimate. For

14

example, Arauz was not the only employee at BBVA who recognized Plaintiff's inability to perform her employment tasks. Tiera Love stated that Plaintiff approached her "for guidance and instruction on how to perform her job" on a daily basis and that Plaintiff's "questions related to basic financial analysis concepts and procedures that an individual with her professed level of education and experience already should have possessed." Love further stated that Plaintiff's inability to work independently "began to negatively impact [Love's] ability to perform [her] own job, as [she] was undertaking the tasks of both [] jobs just to ensure they were completed in a timely and satisfactory manner."

In sum, Plaintiff presented no evidence that Defendant's legitimate, nondiscriminatory reason for terminating her employment was a mere pretext for gender discrimination. To the contrary, the record shows that Plaintiff consistently was unable to perform her job-related duties.

## IV. Title VII Retaliation Claim

Title VII prohibits employers from retaliating against an employee because she has opposed acts made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). Absent direct evidence, when analyzing claims for retaliation, we employ the *McDonnell Douglas* analytical framework. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). "Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) [s]he engaged in a statutorily protected

15

activity; (2) [s]he suffered an adverse employment action; and (3) [s]he established a causal link between the protected activity and the adverse action." *Id.* at 1307–08. Title VII retaliation claims require that the "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ___, ___, 133 S. Ct. 2517, 2534 (2013).

Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Bryant*, 575 F.3d at 1308. If the defendant carries this burden, the plaintiff must demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions. *Id.* Finally, "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010).

Plaintiff argues that the district court erred in finding that she failed to show a causal connection between her complaints about her differential treatment and the discipline she faced. We address only the causation element of Plaintiff's prima facie retaliation claim because her termination was clearly an adverse action and the district court assumed, without deciding, that Plaintiff had engaged in protected conduct by submitting the August 7 memo in which she contested the

16

decision to place her on probation and claimed that she was being subjected to "retaliation" and a "hostile work environment."

The district court did not err in concluding that Plaintiff failed to show that her protected conduct was a "but-for" cause of her termination. *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at ___, 133 S. Ct. at 2534. As discussed in Part III, *supra*, the record shows that Plaintiff was terminated because of her ongoing performance issues culminating in the poorly-performed assignment she submitted after she was placed on probation.

The undisputed facts demonstrate that Plaintiff was placed on probation on August 6 and was warned that failure to immediately improve "can result in further disciplinary counseling, up to and including termination of employment." The next day, she submitted her written rebuttal to the probation document and complained of a "hostile work environment" and "retaliation." Yet just two days later, Plaintiff submitted a project containing errors of the same type she had been committing throughout her eleven months of employment. Plaintiff's termination on September 12 was based on her ongoing performance problems, culminating in this poorly-performed task submitted during her probationary period. Moreover, Plaintiff cannot insulate herself against termination by making a discrimination complaint in response to being placed on probation for the same inadequate work that ultimately led to her discharge. *Alvarez*, 610 F.3d at 1270.

In sum, Plaintiff has failed to prove the but-for causation necessary to support her claim of retaliation. And even if Plaintiff did establish a prima facie case, her retaliation claim fails for the same reason her disparate treatment claim fails: her failure to provide evidence that Defendant's stated reasons for its actions were a mere pretext for illegal discrimination.

## V.  FMLA Interference and Retaliation Claims

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee has the right to be restored to her original position or an equivalent position following FMLA leave. 29 U.S.C. § 2614(a)(1). The FMLA creates two types of claims to preserve and enforce the rights it creates: "interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, and retaliation claims, in which an employee asserts that [her] employer discriminated against [her] because [s]he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted).

An FMLA interference claim requires the plaintiff to show that she was entitled to a benefit denied by her employer. *Id* at 1206–07. However, "the right

to commence FMLA leave is not absolute, and [] an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010). Similarly, "an employer can deny reinstatement if it can demonstrate that it would have discharged the employee had [s]he not been on FMLA leave." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (quotations omitted).

To establish an FMLA retaliation claim, an employee must demonstrate that her employer intentionally discriminated against her for exercising a right guaranteed under the FMLA. *Id.* "Unlike an interference claim, an employee bringing a retaliation claim faces the increased burden of showing that [her] employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* at 1267–68 (quotations omitted). Absent direct evidence of retaliatory intent, we apply the burden-shifting framework of *McDonnell Douglas*. *Id.* at 1268. To establish a prima facie case of retaliation under the FMLA, an employee must show that: (1) she engaged in activity protected by the FMLA; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Id.*

19

Close temporal proximity between an employee's protected conduct and the adverse employment action is generally sufficient to create a genuine issue as to whether there is a causal connection. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). If the employee successfully demonstrates a prima facie case of FMLA retaliation, the burden then shifts to the employer to articulate a legitimate reason for the adverse action. *Id.* at 1297. Once an employer does so, the employee then must show that the employer's proffered reason was pretextual. *Id.*

Plaintiff argues that the district court did not properly analyze her FMLA interference claim. As to her FMLA retaliation claim, she contends that Defendant retaliated against her because she continued to take FMLA leave, noting that the decision to terminate her was made just after she informed Defendant that she was only released to work half-days because of her medical condition.

The district court properly granted summary judgment on Plaintiff's FMLA claims. Assuming that Plaintiff established a prima facie case of FMLA retaliation based on the close temporal proximity between her requested leave and the final termination decision, the burden of production shifted to Defendant. It presented a legitimate reason for her termination—her inability and repeated failure to perform her job duties—that Plaintiff failed to show was pretextual.

Finally, the district court did not err in determining that Plaintiff's FMLA interference claim was essentially the same as her FMLA retaliation claim. Although Plaintiff may have been trying to argue that by firing her, Defendant "denied" her FMLA leave to which she was entitled (working only half-days), her interference claim is largely a clone of her FMLA retaliation claim. In any event, Plaintiff also failed to establish an interference claim because it is undisputed that Defendant would have terminated her regardless of any FMLA leave she took or requested. *See Krutzig*, 602 F.3d at 1236; *Martin*, 543 F.3d at 1267. Human Resources Partner Dan Howard did not make the final termination decision until after Plaintiff returned from leave, but the decision was based on the independent analysis of Plaintiff's latest work product and Howard's conclusion, after meeting with Plaintiff, that her performance issues were not resolvable.

## VI.  Conclusion

Upon review of the record and consideration of the briefs, we therefore **AFFIRM.**

21