**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 16, 2020**

# In the Court of Appeals of Georgia

A19A2071. CITY OF PENDERGRASS v. RINTOUL et al.

REESE, Judge.

The City of Pendergrass ("the City") appeals from the final judgment entered against it in this whistleblower action, following a jury verdict in favor of Katherine Rintoul ("Appellee Rintoul") and William Garner ("Appellee Garner") totaling over $1,000,000. The City asserts that the trial court erred in failing to grant its motions for a directed verdict. The City also asserts that the jury's damage awards to the Appellees were both arbitrary and unsupported by competent evidence. For the reasons set forth infra, we affirm.

On appeal from a jury verdict in a civil case, we view the record in the light most favorable to the jury's verdict and the trial court's final judgment.[1] So viewed, the record shows the following facts. Appellee Rintoul was the City Clerk for the City from January 2005 to July 2009. In addition to City Clerk, Appellee Rintoul held the additional positions of Election Superintendent, Librarian, and Court Clerk for the City. Appellee Garner was a lieutenant with the City police department from January 2005 to September 2009.

In June 2009, the Appellees gathered evidence which they believed equated to, inter alia, misuse of public tax moneys, misuse of local-option sales tax ("LOST") funds, misuse of city equipment, bribery of public officials, and employment of an undocumented immigrant. On June 27, 2009, City Administrator and Chief of Police, Robert Russell ("Russell"), met with Appellee Garner, accused Garner of making derogatory statements about him, and threatened to terminate Garner as a result. Appellee Garner recorded the conversation with Russell via the audio microphone on Garner's duty belt, which transmitted to the recording device in his patrol car. The following day, on June 28, the Appellees met with Melvin Tolbert, the mayor

---

[1] See *Ga. Dept. of Transp. v. Miller*, 300 Ga. App. 857, 858 (686 SE2d 455) (2009).

("Mayor Tolbert") of the City. The Appellees supplied Mayor Tolbert with the documents, recordings, and evidence in order for him to investigate what the Appellees alleged were misappropriation of city funds, misuse of city property, bribery of public officials, and other misdeeds by city officials and employees. Appellee Garner also voiced concerns about potentially illegal actions by Russell.

Mayor Tolbert requested time to investigate the allegations made by the Appellees, at which time he requested that City Attorney Walter Harvey ("Harvey") review the documents and evidence provided by the Appellees to determine if Russell had misused city funds. Approximately a week later, Harvey reported the results of his investigation to Mayor Tolbert. As a result of the investigation, Mayor Tolbert docked Russell's salary by $10,000 per year, and removed him from his position as Chief of Police. A new chief of police, James LaRoque, was later appointed to replace Russell.

Following the Appellees' conversation with Mayor Tolbert, Russell issued orders, verbally and in writing, to Appellee Garner mandating that Garner be isolated from all city employees. Russell also commanded Garner not to converse with any city employee, including fellow members of the police force, or he would face termination. The City moved the location of the police station, records and all other

police personnel to City Hall, but refused to allow Appellee Garner access to the building after changing the locks. The City required Appellee Garner to work in the former police building alone, sequestered from all other city employees without telephone service or any of the essential records and equipment required to perform his duties as a police officer, except for the use of his patrol vehicle while on duty.

A fellow police officer working for the City filed a complaint against Appellee Garner, which led to an investigation against Garner. The City filed a statement with the Georgia Peace Officers Standards and Training ("POST") Council regarding Appellee Garner's resignation, stating that Garner had resigned in lieu of termination. At trial, James LaRocque testified that he knew Appellee Garner's POST record (which details a law enforcement officer's training, employment history, and violations) was incorrect, but did not take any attempts to remove or correct the false statement. The incorrect statements in Appellee Garner's POST record negatively affected his ability to gain employment with other departments following his resignation from the City.

In July 2009, Mayor Tolbert met with all city employees to inform them that there would be large-scale layoffs because of the city's perilous economic situation. Appellee Rintoul was terminated at the conclusion of the meeting, along with three

other city employees. However, the other three employees were rehired shortly thereafter. Further, within weeks of terminating Appellee Rintoul, the City hired additional police officers, James LaRoque as chief of police, and a city clerk.

The Appellees initially sued the City and eight individual city officials alleging retaliation under the Georgia Whistleblower Act,[2] Racketeer Influenced and Corrupt Organizations Act violations, tampering with evidence, witness tampering, theft by conversion, theft of services, criminal conspiracy, bribery, extortion, and making false statements. The trial court granted the City's partial motion for summary judgment. On interlocutory review, we vacated the trial court's decision in June 2017.[3]

By the time of trial, a single retaliation claim remained, with the City remaining as the sole defendant. At the close of the presentation of the Appellees' evidence, the City moved for a directed verdict, arguing that Appellee Garner was collaterally estopped from rearguing that he had been constructively discharged and that the City was not a "public employer" subject to the Georgia Whistleblower Act,[4] because it did not receive state funds. The trial court denied the City's motion, and the City

---

[2] See OCGA § 45-1-4.

[3] See *Rintoul v. Tolbert*, 341 Ga. App. 688 (802 SE2d 56) (2017).

[4] See OCGA § 45-1-4.

5

renewed its motion for directed verdict at the close of evidence. The jury returned a verdict for the Appellees on their claim of retaliation. Following a hearing on a motion for attorney fees, the trial court issued a final judgment on January 30, 2018. This appeal followed.

"The standard of appellate review of the trial court's denial of a motion for a directed verdict is the 'any evidence' standard."[5] Additionally, "a jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law."[6] Moreover, "[t]he issue of damages is a matter for the jury, and a reviewing court should not interfere with the jury's damages award unless it is so small or excessive that it justifies an interference of gross mistake or undue bias."[7] Additionally,

> the appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the

---

[5] *F. A. F. Motor Cars v. Childers*, 181 Ga. App. 821 (1) (354 SE2d 6) (1987) (citation and punctuation omitted).

[6] *Horan v. Pirkle*, 197 Ga. App. 151, 153 (2) (397 SE2d 734) (1990).

[7] *Green v. Proffitt*, 248 Ga. App. 477, 478 (1) (545 SE2d 623) (2001).

verdict, the denial of defendant's motion for directed verdict, new trial and j.n.o.v. will not be disturbed.[8]

"The jury is the final arbiter of the facts, and the verdict must be construed by the trial and appellate courts in the light most favorable to upholding the jury verdict."[9] Further, in order to prevail on a motion for directed verdict, an appellant must show "that there was no conflict in the evidence as to any material issue and that the evidence introduced, with all reasonable deductions therefrom, demanded the verdict sought."[10]

With these guiding principles in mind, we turn now to the City's specific claims of error.

1. The City asserts that the trial court erred in failing to grant its motions for directed verdict. Specifically, the City contends that the Appellees failed to prove it

---

[8] *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 162 (1) (473 SE2d 256) (1996) (citations and punctuation omitted).

[9] *Puckette v. John Bailey Pontiac-Buick-GMC Truck*, 311 Ga. App. 138 (714 SE2d 750) (2011) (citations and punctuation omitted).

[10] *Georgian Fine Properties v. Lang*, 347 Ga. App. 635 (820 SE2d 464) (2018) (citations and punctuation omitted).

is a "public employer" and that the Appellees were not "public employees" within the

meaning of the Georgia Whistleblower Act. We disagree.

Under OCGA § 45-1-4 (a) (4), the term "[p]ublic employer" is defined as

the executive, judicial, or legislative branch of the state; any other
department, board, bureau, commission, authority, or other agency of the
state which employs or appoints a public employee or public employees;
or any local or regional governmental entity that receives any funds from
the State of Georgia or any state agency.

Under OCGA § 45-1-4 (a) (3), the term "[p]ublic employee" is defined as

any person who is employed by the executive, judicial, or legislative
branch of the state or by any other department, board, bureau,
commission, authority, or other agency of the state. This term also
includes all employees, officials, and administrators of any agency
covered by the rules of the State Personnel Board and any local or
regional governmental entity that receives any funds from the State of
Georgia or any state agency.

The Georgia Whistleblower Act "applies to the receipt by a public employer from any

public employee of complaints or information concerning the possible existence of

any activity constituting fraud, waste, and abuse in or relation to any state programs and operations under the jurisdiction of such public employer."[11]

In its motion in limine, the City stated that the issues to be tried included whether the City was a public employer, whether the Appellees were public employees, whether the Appellees made a disclosure under OCGA § 45-1-4, and whether the City retaliated against the Appellees. Within the joint pre-trial order, at the commencement at trial, the City asserted that whether the City violated the Georgia Whistleblower Act was a decision for the jury.

During trial, the court received two motions for a directed verdict from the City. The first motion was given by the City at the conclusion of the Appellee's case-in-chief, and the second motion was given at the close of evidence. At the conclusion of each motion for directed verdict, the court ruled that the evidence created arguable questions for the jury, and denied the motions.

At trial, Appellees identified three sources of funds that the City had received from the State of Georgia, including: LOST receipts; a check for $68 that the city's municipal court received from the Georgia Department of Drivers Services ("DDS");

---

[11] *Caldon v. Board of Regents of Univ. System of Ga.*, 311 Ga. App. 155, 158 (715 SE2d 487) (2011) (punctuation and footnote omitted).

9

and services and grant money provided to the City's library by the Georgia Library Public Information Network for Electronic Services ("PINES") and Piedmont Regional Library System ("PRLS").

The City offered the rebuttal testimony of its auditor. Both Appellee Rintoul and Mayor Tolbert testified that the City had received funds from the State of Georgia. Mayor Tolbert testified that the City did receive funds from the State of Georgia outside of LOST and special-purpose local-options sales tax funds. The auditor conceded that neither she nor her firm handled the auditing accounts of the City during the time frame at issue. Under cross-examination, the auditor testified that the word "refund" did not appear on the check from Georgia DDS. She also testified as to the City's library system, confirming the City availed itself of a high speed internet line made available and paid for by the State of Georgia. Although the City did not physically receive money, it received the value from the State of Georgia for the high speed internet line. The City renewed its motion for directed verdict following the testimony of the city auditor.

The Appellees provided evidence to support the verdict including, inter alia, the testimony of Appellee Rintoul regarding the types of funds the City had received from the State of Georgia for its public library and how the City received LOST funds

10

from the State. Appellee Rintoul also testified regarding how city funds were misappropriated by the use of city funds on, inter alia, personal dinners, lawn equipment for use on personal property, and loans to city employees. Appellee Rintoul's testimony regarding funding was relevant, because it showed that the City received funds from the State, making the City a public employer.[12] Moreover, by providing testimony regarding state funding, Appellees were able to show that they were public employees employed by the City.[13]

We have previously held that it is improper for a trial court to grant a motion for directed verdict where the expert testimony that forms the support for the verdict is based upon speculation, guess, or conjecture.[14] Here, there were conflicts in the evidence as to material issues of the matter,[15] which are questions for the jury to

---

[12] See OCGA § 45-1-4 (a) (4).

[13] See OCGA § 45-1-4 (a) (3).

[14] See *City of Atlanta v. Hightower*, 177 Ga. App. 140, 143 (338 SE2d 683) (1985) (emphasizing that a verdict dependent on guess, speculation, or conjecture cannot stand).

[15] See *Unified Govt. of Athens-Clarke County v. North*, 250 Ga. App. 432, 437 (2) (551 SE2d 798) (2001) ("A directed verdict is authorized only when there is no conflict in the evidence as to any material issue and the evidence introduced with all reasonable deductions therefrom, shall demand a particular verdict.") (citations and punctuation omitted).

resolve.[16] Ultimately, the jury determined that the City had "'retaliate[d]' against [Appellee] Rintoul[,]" who was a "public employee[,]" and that the City had "'retaliate[d]' against [Appellee] Garner," who was a "public employee[,]" under OCGA § 45-1-4. Therefore, the trial court did not err in denying the City's motions for directed verdict.

2. The City contends that the trial court erred in refusing to dismiss Appellee Garner's claim, because Garner was collaterally estopped from arguing that the City had constructively discharged him. Specifically, the City argues that Appellee Garner's resignation was not the product of constructive termination and that he suffered no "retaliation" within the meaning of the Georgia Whistleblower Act. We disagree.

In addition to seeking a directed verdict regarding the "public employer" subsection of the Georgia Whistleblower Act, the City moved for a directed verdict concerning Appellee Garner's claims of retaliation. Under the Georgia Whistleblower Act, "retaliation" is defined as

---

[16] See *Canton Plaza v. Regions Bank*, 315 Ga. App. 303 (732 SE2d 449) (2012) ("A motion for directed verdict should not be granted where there exists even slight material issues of fact, because the trial court is substituting its judgment for the jury's[.]") (citations and punctuation omitted).

the discharge, suspension, or demotion by a public employer of a public employee or any other adverse employment action taken by a public employer against a public employee in the terms or conditions of employment for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency.[17]

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."[18] Moreover, for a constructive discharge to occur,

> [t]he general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.[19]

---

[17] OCGA § 45-1-4 (a) (5).

[18] *Bryant v. Jones*, 575 F3d 1281, 1289 (II) (A) (3) (11th Cir. 2009) (In the context of equal protection violations under § 1983, intentional race discrimination violations under § 1981, and civil rights violations under § 1985, an African American county manager brought claims alleging that officials retaliated against him for refusing to support discrimination against white managers.) (citations omitted).

[19] *Young v. Southwestern Savings and Loan Assn.*, 509 F2d 140, 144 (I) (5th Cir. 1975) (In the context of civil rights violations against former employee for alleged religious discrimination.) (citations omitted).

13

The City argues that Appellee Garner's assertion that he was subject to retaliation and a hostile work environment is barred by collateral estoppel. The issue of collateral estoppel, however, had already been decided in the trial court's prior summary judgment order. While Appellee Garner was barred from asserting the constructive discharge claim, the trial court's summary judgment order did not state that Garner was barred from asserting a retaliation claim. Although Appellee Garner testified at trial that he believed he had been constructively discharged from the City's police department, he mainly asserted that he was subject to retaliation and a hostile work environment.

The City argues that the *Murray-Obertein* decision of this court should apply here. We disagree. *Murray-Obertein* concerned a former employee of the Government Transparency and Campaign Finance Commission that asserted claims for purportedly retaliatory acts, which allegedly took place after her employment with the Commission.[20] In *Murray-Obertein*, we held that

> in looking to the plain and unambiguous language of these provisions
> in concert with the WBA's definition of a "public employee" as a person
> "who is employed," it is evident that a "public employee" as defined by

---

[20] See *Murray-Obertein v. Ga. Govt. Transparency Comm.*, 344 Ga. App. 677 (812 SE2d 28) (2018).

14

the statute does not apply to a former employee who was allegedly retaliated against after her employment, but instead limits retaliation to acts committed against current employees.[21]

Here, Appellee Garner asserts claims of retaliatory actions that took place while he was still employed with the City and the post-employment mischaracterization of Garner's POST record was a continuation of the retaliation that occurred while he was a City employee.

There was evidence of retaliation for the jury to consider, which compelled it to return a verdict in favor of the Appellees. Appellee Garner testified that prior to the conversation with Mayor Tolbert in June 2009, he was an integral part of the City's police department and that after the meeting the City's actions toward Appellee Garner dramatically worsened. The jury heard audio recordings of the verbal abuse and threats to Appellee Garner's employment from Russell , as well as testimony regarding the immediate ten-day suspension Garner received following his conversation with Mayor Tolbert. Appellee Garner also testified that although the suspension had been revoked, the City prohibited him from taking his patrol vehicle home, which Garner stated was a $5,000 to $10,000 a year benefit of his employment.

---

[21] Id. at 681.

15

Appellee Garner was subjected to loss of pay and rank, and faced isolation from his colleagues when the City moved the police station to city hall and denied Garner access.

In addition to the retaliation he faced while still employed with the City, Appellee Garner also faced the effects of the City's retaliation after resigning in September 2009. The City knew that Appellee Garner's POST record contained erroneous and false information relating to his employment with the City, but failed to correct the information. Due to the negative effect of having "resigned in lieu of termination" listed on his POST record, Appellee Garner faced difficulty in finding another job in law enforcement when the City failed to correct Garner's POST record. Appellee Garner was unemployed for eight months and was unable to find a job close to where he lived, so he accepted a job as manager of an auto body shop, requiring him to drive 130 miles per day. Following his employment with the auto body shop, Appellee Garner began working part time as a mall security guard, working approximately 32 hours per week. The jury found that the City retaliated against the Appellees and based on the foregoing, the trial court did not err in denying a directed verdict.

16

3. The City argues that the jury's award of damages to each Appellee were both arbitrary and unsupported by competent evidence. Specifically, the City asserts that neither Appellee Garner nor Appellee Rintoul provided evidence sufficient to permit the jury to award any amount of damages for lost wages. Additionally, the City contends that the evidentiary bases for the jury's lost wages awards were merely products of speculation. We disagree.

> The general rule on appeal of an award of damages is that a jury's award cannot be successfully attacked so as to warrant a new trial unless it is so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice, or gross mistake on the part of the jurors. Even though the evidence is such to authorize a greater or less award than that actually made, the appellate court will not disturb it unless it is so flagrant as to shock the conscience. Moreover, the trial court's approval of the verdict creates a presumption of correctness that will not be disturbed absent compelling evidence.[22]

The Georgia Whistleblower Act permits a prevailing public employee to recover, inter alia: reinstatement to the same position held before the retaliation or to an equivalent position; reinstatement of full fringe benefits and seniority rights;

---

[22] *Booker v. Older Americans Council of Middle Ga.*, 278 Ga. App. 407, 411 (4) (629 SE2d 69) (2006) (citations and punctuation omitted).

17

compensation for lost wages, benefits, and other remuneration; and any other compensatory damages allowable by law.[23]

Here, as the arbiter of the award and the finder of fact, the jury decided the award of damages based upon the evidence and testimony of the Appellees. Contrary to the City's argument that neither Appellee provided a basis for the jury to determine lost wages, Appellee Rintoul testified that she earned $16 per hour while working as the City Clerk. Appellee Rintoul further testified that she was able to find short-term employment for approximately a year and a half, but moved to Washington because her husband accepted a job there. Appellee Rintoul later moved back to Georgia, but was unable to find work due to her pending case against the City.

Appellee Garner testified that he earned $17.34 per hour at the time of his resignation, but at the time of trial was only earning $10 per hour. The jury awarded Appellee Rintoul $218,000 in lost wages and benefits of employment, and awarded Appellee Garner $175,000 in lost wages and benefits of employment. The jury based its award determination on testimony from the Appellees and was therefore not a product of bias, prejudice, or gross mistake.

---

[23] See OCGA § 45-1-4 (e) (2) (B)-(E).

18

The City also contends that the compensatory damages were excessive. The jury awarded Appellee Rintoul the sum of $300,000 in compensatory damages and awarded Appellee Garner the sum of $372,600 in compensatory damages.

We have previously held that a jury's award of compensatory damages will be upheld "[a]bsent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice, or another improper cause invaded the trial."[24] The jury heard the evidence, observed the witnesses and determined the credibility, veracity and demeanor of both the witnesses and the evidence and made its determination of damages therefrom.

The City approved the verdict form prior to the jury receiving it and inspected the verdict without objection after it was published.[25] Based on the City's approval of the verdict form, it left the determination of damages up to the jury. Moreover, during the charge conference, the City only requested additional verbiage in the verdict form to better define the causal connection between the verdict interrogatories

---

[24] *Central of Ga. R. Co. v. Carter*, 212 Ga. App. 528, 530 (3) (442 SE2d 269) (1994) (citation and punctuation omitted).

[25] See *Tucker v. Love*, 200 Ga. App. 408, 410 (3) (408 SE2d 182) (1991) ("If either party felt the verdict was vague and ambiguous, objection should have been made when the verdict was returned so that the jury could clarify its meaning.") (citations omitted).

and the statute. If the City desired an explanation of the basis for the damage award, it had opportunity to object to the verdict form, which allowed the jury full control to set the damage award, and change or reform the verdict form prior to jury deliberation.[26] Moreover, the City did not request a judgment notwithstanding the verdict at the publication of the verdict, nor did the City file a motion for new trial.[27] Ultimately, the jury weighed the testimony and evidence as presented and made factual determinations in order to award damages to the Appellees based upon those facts. Thus, the City's argument that the jury's damages award was based on mere speculation and grossly excessive is without merit.

*Judgment affirmed. Miller, P. J., and Rickman, J., concur.*

---

[26] See *Southern Crate & Veneer v. McDowell*, 163 Ga. App. 153, 155 (3) (293 SE2d 541) (1982) (explaining that the jury was authorized to place its own value on damages where no apportionment as to the damages sought was requested, and the lump sum verdict form was not objected to when it was returned).

[27] *Southeastern Sec. Ins. v. Hotle*, 222 Ga. App. 161 (1) (473 SE2d 256) (1996) ("The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's [motion] for [directed verdict,] new trial and j.n.o.v. will not be disturbed.") (citations and punctuation omitted).