**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 20, 2025**

# In the Court of Appeals of Georgia

A25A0839. GEORGIA DEPARTMENT OF JUVENILE JUSTICE
v. BRANTON.

DOYLE, Presiding Judge.

The Georgia Department of Juvenile Justice ("DJJ") filed this discretionary appeal of a superior court order affirming a special master's administrative ruling ("the Ruling") under the Georgia Fair Employment Practices Act ("FEPA").[1] The Ruling held that DJJ discriminated against Kevin Branton, who claimed a disability and was in training with the DJJ as a cadet at the Metro Regional Youth Detention Center ("Metro"). DJJ contends that the superior court erred by holding that (1) there was direct evidence of discrimination and retaliation, and (2) the DJJ

---

[1] OCGA § 45-19-20 et seq. This Court granted DJJ's discretionary appeal application on November 1, 2024.

constructively discharged Branton. For the reasons that follow, we affirm part of the superior court's order, vacate part, and remand for proceedings consistent with this opinion.

When we review a superior court's order in an administrative proceeding, this Court's "duty is not to review whether the record supports the superior court's decision" but rather is to determine "whether the record supports the final decision of the administrative agency."[2] "We also determine whether the superior court has, in its own final ruling, committed an error of law."[3]

So viewed, the record shows that Branton, a United States Army veteran, was accepted by the DJJ for employment at Metro. He intended to become a youth correctional officer, which began with training as a cadet and then becoming Peace Officer Standards and Training ("POST") certified. Branton was honorably discharged from the Army due to an injury he sustained to his foot, and he included

---

[2] (Punctuation omitted.) *Ga. Dept. of Community Health v. Satilla Health Svcs., Inc.*, 266 Ga. App. 880, 885 (1) (c) (598 SE2d 514) (2004), quoting *Ga. Dept. of Community Health v. Gwinnett Hosp. System, Inc.*, 262 Ga. App. 879, 883 (586 SE2d 762) (2003).

[3] (Punctuation omitted.) *Dept. of Community Health v. Emory Univ.*, 351 Ga. App. 257, 262 (830 SE2d 628) (2019), quoting *Carolina Tobacco Co. v. Baker*, 295 Ga. App. 115, 118 (1) (670 SE2d 811) (2008).

this information in his application to DJJ. The injury made it difficult for Branton to stand for long periods of time, necessitating occasional five- to ten-minute breaks to rest his foot. Branton also included a birth certificate and immigration form showing December 17, 1994, as his date of birth and a medical "shaving profile" documenting a skin condition that causes inflammation when he shaves.

Upon starting as a cadet on June 1, 2018, Branton sought a shaving exemption, and after some exchanges with Ebony Jones, a Metro human resources staff member, he received the exemption.[4]

With respect to Branton's foot injury, he began to experience discomfort due to being required to stand or be on his feet for ten to twelve hours at a time while on duty. Branton approached another cadet, Derrick Baker, whom he believed to be his direct supervisor,[5] and asked if he could "just take a break off of my feet for a certain

---

[4] Jones apparently doubted the authenticity of a doctor's letter and required Branton to obtain a new copy on letterhead, which he did.

[5] Baker apparently had an informal leadership role within the cadets because he was returning to the cadet position after failing to complete POST training due to injury. Baker represented that he had authority to make recommendations regarding who would be approved to attend POST training , but according to the DJJ general counsel, he did not have any formal recommendation or supervisory authority.

small portion of the day." Baker told Branton he would "get back to" him, giving Branton a disappointed look.

Baker never took any action on Branton's request, so Branton occasionally took brief breaks as needed. Thereafter, as part of the required process for applying for POST training,[6] Branton learned that his application documents contained a birth certificate that listed an incorrect birth year — it stated 1993 instead of 1994. Based on this, Branton learned that his POST application had been delayed. Branton disputed that he had submitted the incorrect birth certificate, suspecting that it had been altered by someone else. He requested an investigation into the alteration, and the next day, June 28, 2018, he was suspended with pay. His suspension with pay was documented in a letter advising him not to communicate with any DJJ employees unless requested by the director. On the same day, Metro Director Monique Brandenburg filled out a human resources form requesting Branton's termination due to the altered birth certificate, as well as his "questionable" shaving profile documentation.

---

[6] Cadets were required to complete POST certification within six months of hiring.

Despite being told that his suspension was with pay, Branton was not paid. He asked the local human resources staff about his pay and any updates about the investigation regarding the incorrect birth certificate, each time being deferred by vague explanations.

Eventually, Branton reached Wendy Edwards, a human resources specialist in DJJ's central Employee Relations Division. She looked into the matter and confirmed that Metro had never requested continued paychecks for him, and she would remedy the error immediately, including back pay. Upon further investigation by the Employee Relations Division, Edwards apologized to Branton about his treatment, and by August 1, 2018, she offered him his job back and told him that he could return to work or transfer to another facility, either one in the same capacity.

After thinking it over for a few days, Branton told Edwards that he would resign on August 6, 2018. He explained at the special master hearing:

> [I]t's kind of hard to go back to a place like that. . . . You know, this is the first time anything like this has ever happened in my life where I'm accused of fraudulently anything. So, I'm extremely scared to go back and work for a company like DJJ, if you're changing my birth certificate and stuff like that. I'm very scared to go back and work with you.

The following month, Branton filed an employment discrimination complaint with the Georgia Commission on Equal Opportunity ("GCEO"), raising claims of disability discrimination and retaliation based on his treatment after requesting breaks to rest his foot. Upon investigation, the GCEO issued a determination that "there is reasonable cause to believe that [DJJ] has engaged in an unlawful practice under [OCGA § 45-19-20 et seq.] as the result of its . . . failure to consider [Branton's] valid reasonable accommodation request made in connection with a legally protected disability." The matter was referred to a special master who, after an evidentiary hearing, issued an opinion finding, in part, that DJJ discriminated and retaliated against Branton for engaging in protected behavior — seeking a shaving waiver and speaking to Baker about his foot injury — and that he was constructively discharged. As a remedy, the special master ordered DJJ to pay Branton five months of back pay,[7] remove any adverse disciplinary references from his employment records, pay $1,543.30 in Branton's attorney fees, revise its policies, and conduct further training.

The DJJ filed a petition for judicial review in the superior court. The DJJ asserted legal error in (a) the holding that there was direct evidence of discrimination

---

[7] The special master opined that this amount was commensurate with the time needed for an additional job search.

and retaliation, and (b) the holding that Branton was constructively discharged. We agree in part.

First, it is helpful to sketch out the applicable legal background. Branton first filed this discrimination complaint with the GCEO, pursuant to FEPA. That Act

> provides an administrative scheme for the resolution of employment discrimination claims brought by employees of the State. Its remedies include reinstatement and backpay. Among the purposes of the FEPA is the prevention of employment discrimination against public workers based on race, color, religion, national origin, sex, disability, or age.[8]

FEPA defines "disability" as "a physical or mental impairment which substantially limits one or more of a person's major life activities, unless an employer demonstrates that the employer is unable to accommodate reasonably to an employee's or prospective employee's disability without undue hardship on the conduct of the employer's operation."[9] The Act also provides that "[i]t is an unlawful practice for an employer: . . . To fail or refuse to hire, to discharge, or otherwise to

---

[8] (Citations and punctuation omitted.) *Augusta Judicial Circuit Office of the Pub. Defender v. Hodge-Peets*, 370 Ga. App. 819, 824 (3) (899 SE2d 363) (2024).

[9] OCGA § 45-19-22 (3).

discriminate against any individual . . . because of such individual's race, color, religion, national origin, sex, disability, or age[.]"[10]

1. *Direct evidence of discrimination and retaliation.* DJJ first contends that the superior court erred by affirming the special master's finding that there was direct evidence of retaliation. It argues that the mere fact that Branton's suspension followed his request for reasonable accommodation does amount to direct evidence of a discriminatory motive prohibited under FEPA. Assuming without deciding that this is true,[11] we note that DJJ makes no challenge to the special master's additional finding that there was "ample circumstantial evidence of discrimination and retaliation." The special master identified evidence of Metro's failure to follow its own policies regarding investigation and suspension, the lack of investigation into the birth certificate, the failure to initiate any process to pay Branton during his suspension,

---

[10] OCGA § 45-19-29 (1).

[11] See generally *Wyatt v. MARTA*, 367 Ga. App. 453, 460 (1) (886 SE2d 832) (2023) ("[D]irect evidence is evidence that establishes the existence of retaliatory intent behind the employment decision without any inference or presumption. Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to retaliate on the basis of some impermissible factor. Direct evidence, by definition, is evidence that does not require an inferential leap between fact and conclusion, and evidence merely suggesting retaliation does not constitute direct evidence.") (punctuation omitted).

Metro's unwarranted skepticism toward Branton's employment documentation in general, the timing of the suspension, and the "incoherencies and contradictions" in Metro's explanations for these events.

DJJ likewise makes no challenge to the superior court's holding that the special master properly applied the burden shifting framework in *McDonnell Douglas Corp. v. Green*,[12] which applies to findings of improper discrimination based on circumstantial evidence.[13] In light of the unchallenged finding of discrimination and retaliation based on circumstantial evidence, and the lack of legal error identified by DJJ, this enumeration presents no basis for reversal.[14]

---

[12] 411 U. S. 792, 802-803 (II) (93 SCt 1817, 36 LE2d 668) (1973). See generally *Wyatt*, 367 Ga. App. at 459 ("Under [the *McDonnell Douglas*] framework, the plaintiff must first make a prima facie case of retaliation. If the plaintiff makes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment decision. If the employer successfully meets this burden of production, then the burden shifts back to the plaintiff to show that each proffered reason was pretext.") (punctuation omitted).

[13] See, e.g., *Wyatt*, 367 Ga. App. at 459-460 (1) (collecting cases).

[14] See *Massey v. State Farm Fire & Cas. Co.*, 363 Ga. App. 588, 592 (871 SE2d 685) (2022) (unchallenged conclusions were abandoned on appeal), citing *Gresham v. Harris*, 349 Ga. App. 134, 138 (1), n. 10 (825 SE2d 516) (2019). See generally *Bailey v. Stonecrest Condo. Assn.*, 304 Ga. App. 484, 488 (1) (696 SE2d 462) (2010) ("If no direct evidence of discrimination is shown, and the plaintiff must rely upon circumstantial evidence, [he] retains the ultimate burden of proving that [he] was the

2. DJJ also contends that the superior court erred by holding that it constructively discharged Branton, arguing that he voluntarily resigned. Based on the high burden to show constructive discharge and the undisputed evidence that DJJ offered Branton his job back at Metro or another location, we agree.

> Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job. Moreover, for a constructive discharge to occur, the general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.[15]

"This is an 'onerous task' and requires pervasive and severe conduct by the employer going beyond that required for a hostile work environment claim. The existence of a

---

victim of intentional discrimination.").

[15] (Citations and punctuation omitted.) *City of Pendergrass v. Rintoul*, 354 Ga. App. 618, 624-625 (2) (841 SE2d 399) (2020) (analyzing a discrimination claim under a whistleblower action), quoting *Bryant v. Jones*, 575 F3d 1281, 1298 (II) (A) (3) (11th Cir. 2009) (addressing equal protection violations under 42 USC § 1983, intentional race discrimination violations under 42 USC § 1981, and civil rights violations under 42 USC § 1985 alleged by a Black county manager who refused to support a "wholesale plan to replace its white county managers").

constructive discharge is determined under an objective, 'reasonable employee' standard, not by reference to a plaintiff's subjective feelings."[16]

Here, the evidence shows that Branton was treated skeptically by his fellow cadet Baker, who told him that he did not see Branton going to POST training: "I don't see . . . a purpose for you on my team at POST," making Branton "feel like I'm dead-weight to the team, almost, because of my disability." Branton was also treated skeptically by local Metro staff, who questioned the accuracy of his credentials and suspended him without following its policy of allowing him two days to remedy the discrepancy and without taking action to investigate the discrepancies. But, aside from this policy violation, confirming the authenticity of paperwork is not, in and of itself, discriminatory, nor is objectively assessing an employee's fitness for duty.[17]

What was discriminatory was targeting Branton based on his disability by allegedly creating a false birth certificate and suspending him improperly without pay

---

[16] (Citations, emphasis, and punctuation omitted.) *Ounjian v. Globoforce, Inc.*, 89 F4th 852, 858-859 (III) (A) (11th Cir. 2023).

[17] See generally OCGA § 45-19-22 (4) ("'Discrimination' means any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, color, religion, national origin, sex, handicap, or age . . .").

or investigation. As Branton concedes, however, this was addressed quickly by central DJJ human resources staff who immediately apologized, investigated the relevant events, and remedied the actions taken by Metro by paying him salary owed and offering him his job back in the same capacity at any DJJ location. The entire episode, from hiring to suspension to reinstatement, occurred over the course of approximately one month.[18]

Also, it is important to note that the special master specifically found that the informal rest requests that Branton made to Baker, who was essentially another cadet, did not rise to the level of a formal request for a reasonable accommodation for his disability. Therefore, the special master held that DJJ had not failed in its duty to provide a reasonable accommodation under applicable disability standards.[19]

---

[18] Compare *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F3d 752, 754 (II) (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.").

[19] In light of this, questions regarding Branton's fitness to perform the duties required of him in this field and the reasonableness of his requested accommodation are not before us.

This record lacks evidence of "pervasive and severe conduct"[20] supporting a finding of constructive discharge. As found by the special master, by the time Branton elected to resign, Branton's shaving exemption had been granted, he had not actually been denied an accommodation for his foot injury, and he had been offered placement back in the position he would have been in, with the opportunity to work at a different location with different staff and proceed with his training as planned. Although Branton expressed his subjective distrust of Metro, the standard is an objective one,[21] and the episode regarding his birth date was remedied by employee relations staff. Based on this record, the superior court erred by concluding that a reasonable employee would not feel he could return to work under those conditions, particularly after DJJ's Employee Relations Division had acknowledged and reversed the improper discipline from Metro.[22] Accordingly, we reverse the portion of the judgment holding that Branton was constructively discharged.

---

[20] *Ounjian*, 89 F4th at 858 (III) (A).

[21] See id. at 859 (III) (A).

[22] Cf. *Kilgore*, 93 F3d at 754 (II).

What remains of the judgment is the correct determination that DJJ engaged in an unlawful practice by retaliating against Branton "when he sought a reasonable accommodation for his [shaving profile] and asked his co-worker about an accommodation for his left foot."[23] This authorized remedial action under OCGA § 45-19-38 (c), but in light of our holding herein, we vacate the judgment in part and remand for an entry of remedies by the special master in a manner consistent with this opinion.[24] In doing so, we make no opinion on which of the available remedies are appropriate.

*Judgment affirmed in part, vacated in part, and case remanded with direction. Markle and Padgett, JJ., concur.*

---

[23] See OCGA § 45-19-29 (1).

[24] See 45-19-38 (b) (establishing a remedy is for the hearing officer); OCGA § 45-19-39 (b) (authorizing the superior court to remand on appeal to that court).